STATE OF CONNECTICUT *v.* RAYMOND T. DELVECCHIO, JR.
(10884)

PETERS, HEALEY, SHEA, GRILLO and COVELLO, Js.

Argued June 7—decision released September 13, 1983

*Howard T. Owens, Jr.,* with whom, on the brief, was *Kevin L. Burns,* for the appellant (defendant).

*Carl Schuman,* assistant state's attorney, with whom was *John J. Kelly,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. A jury found the defendant, Raymond T. DelVecchio, Jr., guilty of two counts of arson in the first degree in violation of General Statutes § 53a-111 (a) (1) and of two counts of criminal mischief in the first degree in violation of General Statutes § 53a-115 (a) (1).[1] He has appealed from the judgment

[1] The defendant was charged in seven separate informations. Two of the informations each charged a single count of arson in the first degree. Two

of conviction raising a number of claims of error, some of which we need not reach because of our disposition of his appeal.

Those claims made by the defendant which warrant discussion are (1) whether the trial court erred in its instructions on proof beyond a reasonable doubt; (2) whether the court erred in allowing the state to prove the corpus delicti through the statements of the defendant; and (3) whether the court erred in permitting the state to introduce inculpatory statements of the defendant from tape recordings made during an undercover police investigation.

The evidence before the jury included the following: The defendant and Fay Dorso were married in July, 1976. They separated four months later, at which time the defendant moved out of their apartment at 12 High Street, a three story building in Derby. He had told her that if she went through with the divorce, he would burn down the apartment. On July 16, 1978, while the first floor was occupied by one James Maloney and his family, the building was damaged by a fire.[2] In fleeing from the fire, Mrs. Maloney sustained a burn to her leg and, as she ran out of the house, the upper porches fell just behind her. The Maloney apartment alone sustained damage of $4000.

more informations each charged a single count of criminal mischief in the first degree. The four guilty verdicts were returned on these four informations.

The jury returned not guilty verdicts on the remaining three informations. One charged a count of arson in the second degree, one charged a count of arson in the third degree and one charged two counts of larceny in the second degree.

The court granted the defendant's motion to consolidate all seven informations for trial.

[2] Fay Dorso testified that, although at that time she resided with her parents, she still had "belongings" at 12 High Street.

The Derby fire marshal was at the scene as the High Street building was burning. A "loud report" or explosion had preceded the fire, and its spread was "fast" and "rapid." After an investigation, and on the basis of his training and experience, he believed "some sort of accelerant had to be used." The color of the fire on High Street, i.e., "a volatile orange flame," was consistent with the use of gasoline as an accelerant. A Derby police officer, working at the fire, observed the defendant across the street as the building was burning.

On June 27, 1978, the residence of Charles LaRowe and his family at 21 Derby Avenue in Derby was extensively damaged by fire. His residence was about seventy-five feet away from that of the defendant with whom he had a prior disagreement which resulted in the summoning of police.[3] The Derby fire marshal came to the scene of this fire while it was still aflame and thereafter undertook an investigation. He lived in the area of this fire and testified that firecrackers were going off that night and that there was one louder sound just before this fire report came over his fire radio. In the area of what he determined to be the point of origin of this fire he found "paint cans, paper, regular debris from old wallpaper." He considered the fire of "a suspicious nature," and gave his opinion that there was "no plausible method of ignition" which he could find "except relating it back to probably a firecracker setting off the debris that was there." Several photographs of various parts of the building after the fire were introduced as he testified.

From April, 1972, to October, 1978, the defendant was employed as a truck driver with an oil company in Derby known as Petrol Plus. He was terminated by Petrol Plus because of his arrest for stealing gasoline from the terminal of Petrol Plus' supplier. On February

---

[3] This incident involved the threatened use of a firearm.

19, 1979, the radiators of six trucks owned by Petrol Plus were damaged at the company yard in Derby. There was a hole in each radiator made by an iron bar and the coolant had all run out. This caused a major disruption in the business of Petrol Plus at a very busy time. The repair bill for this damage was $9300.

After her separation from the defendant, Fay Dorso moved to 7 Maple Street, Seymour. Ivy Poulin and Roberta Poulin also lived at that address. While attempting to contact Fay, the defendant spoke on the telephone with Roberta Poulin several times and eventually arranged to take her to the racetrack. When they went to the racetrack, the defendant met her at her car which she parked in a public lot across the street from Rudy's Pub in Seymour. During the day of July 22, 1980, the defendant called Roberta Poulin at her place of employment and told her that her friend Tom Rider had called and harassed the defendant's mother. He told her that she "would have to put a stop to it or else." At about eleven o'clock that night a police officer came to her home to report that her car had been badly damaged in the public parking lot across from Rudy's Pub. She accompanied the officer to this parking lot where she customarily parked. When she had parked her car there for the night, the windows were "up tight" and the doors locked. When she arrived with the officer, she found the passenger window broken, most of the inside burned, the dashboard, including the dials, ruined and the roof "entirely burned" on the inside. She said "[e]verything was just sort of melted and blackened." Poulin also noticed "a lot of broken green glass" on the front seat on the passenger side although she had not left any green bottle or green glass on the seat when she came home from work that day.

During an undercover police investigation which focused on the defendant, a number of tape recordings were made of several conversations he had with the undercover officer in the presence of others. The conversations from the tape recordings were admitted into evidence at the trial and contained certain inculpatory statements of the defendant which served to identify him as the perpetrator of each of the crimes of which he was found guilty.

We take up first the defendant's claim that the court erred in its instructions on the state's burden of proving his guilt beyond a reasonable doubt. During its instructions on reasonable doubt, the court made reference to defense counsel's argument to the jury about reasonable doubt and a football field.[4] The instruction challenged on appeal is as follows: "Now, in his summation to the jury, Mr. Altschuler, defense counsel, made some mention of reasonable doubt, and he gave you one explanation of reasonable doubt, and in giving you examples of reasonable doubt he used two sports similes, one was a baseball game. As I recall, the other one was a football game. He did not, and I have discussed this with him, and he knows I am going to tell you this, he did not mean to infer that you have to go a hundred yards to guilt and that you must go a hundred yards for reasonable doubt. When he said you could get to the twenty yard line, or ten yard line, you got to go to the goal line; he meant to say to the goal line to reach reasonable doubt, not to the hundred yard line or the goal line to reach guilt. I hope you understand this distinction.

"Reasonable doubt is not guilt beyond any doubt. You don't have to go a hundred yards for a guilty finding.

---

[4] In its brief the state contended that the claimed erroneous instruction was "completely induced" by the defendant. In oral argument before us, the state withdrew this claim of inducement.

You got to go somewhere, I suppose, beyond the fifty yard line; where it is in there is up to you to decide. But what Mr. Altschuler meant to say was that in his explanation the hundred yards was to reach the point of reasonable doubt, not reach the point of guilt. I think you can understand the distinction."

The defendant duly excepted to this instruction at the trial. Pointing to the central importance of instructions on the concept of reasonable doubt in a criminal trial, he argues that it effectively lightened the state's burden of proof. Additionally, he claims that, although it followed an accurate statement of law,[5] it was the sole illustration of the concept in lay terms to a jury of laymen and it is, in effect, impossible to say that they were not misled.

---

[5] After stating that the state had the burden of proving the defendant guilty beyond a reasonable doubt, the court said:

"A reasonable doubt is not such a doubt as may be raised by one questioning for the sake of raising a doubt. It is not a surmise. It is not a guess. It is not a conjecture. It is not hesitation springing from feelings of sympathy or pity for the accused, or for any other person or persons who in any way may be affected by your verdict. A reasonable doubt is one founded upon the evidence, one which grows out of the evidence, or want of evidence in this case and is one for which you can, in your own minds, conscientiously give a reason.

"If the facts you may find proven, or the evidence you may deem credible are consistent with, or may reasonably be explained by any other basis than the accused is not guilty, then you must render a verdict in his favor.

"As I have said, the State must prove its case, as I have defined that to you, that is, beyond a reasonable doubt. This does not mean that the State must prove guilt beyond absolute certainty. Absolute certainty is not required. If it were, many crimes would go unpunished and guilty persons in many cases would go free.

"The State is as much concerned in having an innocent person acquitted as having a guilty person punished, but when the presumption of innocence has been overcome, or removed by evidence proving beyond a reasonable doubt that the accused person is guilty of the crime charged, then it is the sworn duty of the jury to enforce the law and to render such a verdict as the evidence warrants. . . ."

The state recognizes the constitutional nature of this claim but argues first that there was no error. It argues that a review of the charge as a whole will so demonstrate. See *State* v. *Carrione,* 188 Conn. 681, 685, 453 A.2d 1137 (1982). Alternatively, it maintains, citing *United States* v. *Hasting,* 461 U.S. 499, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983), that even if there were error, it must be found to be harmless beyond a reasonable doubt in view of the overwhelming evidence of the defendant's guilt. We find error.

It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *United States* v. *Pine,* 609 F.2d 106, 107 (3d Cir. 1979); *State* v. *Mason,* 186 Conn. 574, 585, 442 A.2d 1335 (1982); *State* v. *Kurvin,* 186 Conn. 555, 558, 442 A.2d 1327 (1982); *State* v. *Smith,* 183 Conn. 17, 27–28, 438 A.2d 1165 (1981). The United States Supreme Court has held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* supra, 364. "The [reasonable doubt concept] provides concrete substance for the presumption of innocence— that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' " (Citation omitted.) *In re Winship,* supra, 363. "At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself." *Jackson* v. *Virginia,* 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979).

"The defendants in a criminal case are entitled to a clear and unequivocal charge by the court that the guilt of the defendants must be proved beyond a reasonable doubt." *United States* v. *Crescent-Kelvan Co.,* 164 F.2d 582, 588–89 (3d Cir. 1948); *Hughes* v. *United States,* 363 A.2d 284, 287 (D.C. App. 1976); *State* v. *Smith,* supra. " 'Discussion of the concept [of reasonable doubt] is perhaps the most important aspect of the closing instruction to the jury in a criminal trial.' " *United States* v. *DeVincent,* 632 F.2d 147, 152 (1st Cir.), cert. denied, 449 U.S. 986, 101 S. Ct. 405, 66 L. Ed. 2d 249 (1980), quoting *Dunn* v. *Perrin,* 570 F.2d 21, 25 (1st Cir.), cert. denied, 437 U.S. 910, 98 S. Ct. 3102, 57 L. Ed. 2d 1141 (1978). Where the defendant's contention is that the instructions on this standard diluted or impaired the constitutional requirement of proof of guilt beyond a reasonable doubt that contention must be examined "with the greatest care and concern." *United States* v. *Pine,* supra.

Long ago, the United States Supreme Court said: "Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." *Miles* v. *United States,* 103 U.S. 304, 312, 26 L. Ed. 481 (1881). More recently, Judge Bazelon aptly observed that "[j]udicial attempts to clarify the meaning of the phrase 'reasonable doubt' by explanation, elaboration or illustration . . . more often than not tend to confuse or mislead." *United States* v. *Pinkney,* 551 F.2d 1241, 1244 (D.C. Cir. 1976);[6] see *United States* v. *Clay,* 476 F.2d 1211, 1215 (9th Cir. 1973); *State* v. *Morrison,* 67 Kan. 144, 162, 72 P. 554 (1903). "While an attempt by the trial court to clarify

---

[6] Of the use of examples in jury instructions it has been said that "the jury is likely to give undue weight to examples, since they are easier to comprehend, and it may simply compare the defendant's conduct with the example." *People* v. *Shepherd,* 63 Mich. App. 316, 322, 234 N.W.2d 502 (1975).

the meaning of reasonable doubt is not by itself reversible error . . . the question on appeal is whether the court's statements correctly conveyed the concept of reasonable doubt to the jury." (Citations omitted.) *McCullough* v. *State,* 99 Nev. 72, 75, 657 P.2d 1157 (1983); see *Holland* v. *United States,* 348 U.S. 121, 140, 75 S. Ct. 127, 99 L. Ed. 150 (1954), reh. denied, 348 U.S. 932, 75 S. Ct. 334, 99 L. Ed. 731 (1955). In *McCullough,* the trial court twice described reasonable doubt about " 'seven and a half, if you had to put it on a [zero to ten scale] scale.' " *McCullough* v. *State,* supra, 74. We have had occasion to make clear that, while we are not receptive to quibbling attacks on the reasonable doubt instruction, the prosecution's burden must be made clear. *State* v. *Smith,* supra, 28; see *United States* v. *Hughes,* 389 F.2d 535, 537 (2d Cir. 1968), cert. denied, 396 U.S. 867, 90 S. Ct. 145, 24 L. Ed. 2d 120 (1969).

In determining the effect of the challenged instructions on the validity of the defendant's conviction, we acknowledge the established proposition "that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp* v. *Naughten,* 414 U.S. 141, 146–47, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); *State* v. *Johnson,* 188 Conn. 515, 527, 450 A.2d 361 (1982); *State* v. *Hines,* 187 Conn. 199, 206, 445 A.2d 314 (1982). An erroneous instruction, even of constitutional dimension, is harmless if, when viewed in the context of the whole charge, there is no reasonable possibility that the jury were misled. See *State* v. *Carrione,* supra, 685; *State* v. *Hines,* supra, 209.

The state argues here that, for two reasons, any such error would be harmless beyond a reasonable doubt. First, it claims that the not guilty verdicts on three informations make it clear that the jury fully under-

stood the reasonable doubt concept notwithstanding any "irregularity in the trial court's attempt to clarify the defendant's football field summation."

First, as we must and as the state urges, we have examined the whole charge carefully. We cannot say that such an examination discloses that this flaw in "the heart of the matter"; *Commonwealth* v. *Wood,* 380 Mass. 545, 548, 404 N.E.2d 1223 (1980);[7] was ever cured. The court never instructed the jury that defense counsel's football field analogy was wrong and should be disregarded, nor did the court ever clarify the analogy to correct its misleading aspects. At the end of the charge the court said: "When you go into the jury room and deliberate on the evidence in this case, you should ask yourselves this question. Am I convinced beyond a reasonable doubt of the guilt of this particular accused, as charged in the information? If you are so convinced, you will convict him without hesitation. But if you have a reasonable doubt of his guilt, you will give him the benefit of that doubt and you will acquit him." The football analogy as earlier given went into the jury room completely unrehabilitated.

The state's claim that the jury must have understood the reasonable doubt concept because it acquitted the defendant on three informations lacks merit. "The precise determination of what a jury decided and why can be particularly difficult"; *United States* v. *Standefer,* 610 F.2d 1076, 1095 (3d Cir. 1979); here it would be mere speculation. The state, in argument, admitted that a jury could erroneously acquit a criminal defendant although that is not so with a conviction. See

---

[7] In *Commonwealth* v. *Wood,* 380 Mass. 545, 548–49, 404 N.E.2d 1223 (1980), the court said that "[t]he improper instructions here lie at the core of the judge's definition of reasonable doubt and cannot be described as doubtful 'embellishments'; *Commonwealth* v. *Therrien,* 371 Mass. 203, 207, 355 N.E.2d 913 (1976); on a distinct and correct definition constituting 'the heart of the matter.' Id."

generally *State* v. *Gerdes,* 258 N.W.2d 839 (S.D. 1977). Double jeopardy, of course, operates to protect the defendant as to those charges on which he was found not guilty. *North Carolina* v. *Pearce,* 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969); *State* v. *Jacobowitz,* 182 Conn. 585, 594, 438 A.2d 792 (1981).

The second reason why the state argues that this error was harmless was because there was overwhelming evidence of the defendant's guilt. Here it relies on *United States* v. *Hasting,* 461 U.S. 499, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983). The state appears to argue that we need no longer determine in cases such as this whether it is reasonably possible that the jury were misled; see *State* v. *Carrione,* 188 Conn. 681, 453 A.2d 1137 (1982); but rather claims that we must review the whole record in every case to determine whether there is overwhelming evidence of guilt. In rejecting this claim, we do not believe that *Hasting* mandates any new constitutional analysis in our determining whether reversible error occurs in such cases.

In *Hasting,* the defendants were convicted of serious moral offenses after the trial court denied their motion for a mistrial when their attorney objected during the government's summation to the jury that that argument violated their fifth amendment rights under *Griffin* v. *California,* 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S. 957, 85 S. Ct. 1797, 14 L. Ed. 2d 730 (1965). The Circuit Court of Appeals reversed and remanded for retrial. *United States* v. *Hastings,* 660 F.2d 301 (7th Cir. 1981). In doing so, it declined to apply the harmless error doctrine analysis of *Chapman* v. *California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967), stating that to do so "would impermissibly compromise the clear constitutional violation of the defendants' Fifth Amendment

rights."[8] *United States* v. *Hastings, supra,* 303. The United States Supreme Court reversed and remanded. In doing so, it criticized "[the Circuit Court's] cursory treatment of the harmless-error question and its focus on the failure generally of prosecutors within its jurisdiction to heed the court's prior admonitions about commenting on a defendant's failure to rebut the prosecution's case . . . ." *United States* v. *Hasting,* 461 U.S. 499, 504, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983). Assuming that the Circuit Court was exercising its supervisory powers to discipline its prosecutors, the Supreme Court said: "We hold that the harmless-error rule of *Chapman* . . . may not be avoided by an assertion of supervisory power, simply to justify a reversal of these criminal convictions." *United States* v. *Hasting, supra,* 505. Significantly, it did say that "the essence of the harmless-error doctrine [is] that a judgment may stand only when there is no 'reasonable possibility that the [practice] complained of might have contributed to the conviction.' *Fahy* v. *Connecticut,* 375 U.S. 85, 86–87 [84 S. Ct. 229, 11 L. Ed. 2d 171] (1963)." *United States* v. *Hasting, supra,* 506. This language is substantially similar to the standard applied in such cases of ours as *State* v. *Carrione, supra,* and *State* v. *Hines, supra.* This is strong evidence that the *Hasting* court was not imposing a new constitutional analysis in cases such as the one now before us. Moreover, the gravity and nature of the error preclude the application of any meaningful overwhelming evidence analysis. This is because the touchstone for determining guilt or innocence, i.e., the concept of reasonable doubt, was not properly before the jury because of the flawed instruction. In view of

---

[8] The Seventh Circuit took this position even "[d]espite the magnitude of the crimes committed and the clear evidence of guilt . . . ." *United States* v. *Hastings,* 660 F.2d 301, 303 (7th Cir. 1981).

what we have said, we conclude that it was reasonably possible that the jury were misled by the erroneous instruction.

The second claim raised by the defendant is that the trial court erred in permitting the state "to prove the essential elements of the corpus delicti through the statements of the defendant." This claim is premised on the following facts: Prior to trial, the defendant filed a motion for a bill of particulars and a request for essential facts pursuant to Practice Book §§ 831 and 625, respectively. On December 17, 1980, a hearing was held on both motions. At that hearing, the state objected to both motions on the same grounds. The state claimed that because it had furnished the defendant with both a long form information and the arrest warrant affidavit for each of the counts with which the defendant had been charged, granting the motions would only supply the defendant with information he already had. In addition, it claimed that these documents "set forth sufficient information to prep the defense." The court, *Kulawiz, J.*, denied the motions "based on the premises that [the defendant's counsel] has [the informations and affidavits] . . . ." It also stated that the request for essential facts was denied "[w]ith the understanding as set forth on the record [that] the State is limited to the affidavit concerning the manner in which the fire started."[9]

The defendant claims, therefore, that the state's proof was to be limited, not only by the individual informations, but also by the following affidavits: The affidavit concerning the High Street fire stated, inter alia, that the fire was "ignited by [an] incendiary device which in all probability was a firecracker and an accel-

[9] Because of our disposition of this claim, it is unnecessary to address the state's claim that the court's ruling only affected one of the crimes with which the defendant was charged.

erant of some type." The affidavit concerning the Derby Avenue fire stated, inter alia, that the fire had been "ignited by [an] incendiary device which in all probability was a firecracker exploding amongst some paint cans and other items located on the porch . . . ." Finally, in regard to the count charging the defendant with damaging Roberta Poulin's car, the affidavit stated that the defendant had orally stated that "he set said fire by using a device consisting of a glass container, gasoline, an M-80 (firecracker), and a cigarette."

The defendant's claim on appeal is that his out of court statements that were taped by the undercover police officer were inadmissible because the state had not previously introduced sufficient independent, corroborative evidence of the corpus delicti of each of the crimes with which he was charged. We disagree. Parsing the defendant's claim, we find two questions presented: First, must the state introduce evidence of the corpus delicti *prior* to the introduction of the defendant's admissions and, second, does the fact that the court limited the state's case in terms of the manner in which the crimes were committed affect the nature of what constitutes the corpus delicti of a particular crime.

In regard to the first issue, i.e., must the state introduce independent evidence *prior* to the defendant's admissions, we agree with the defendant that this is ordinarily the better procedure. See C.J.S., Criminal Law § 1046. It is not, however, an absolute prerequisite to introducing the defendant's admissions. See, e.g., *State* v. *Washelesky,* 81 Conn. 22, 29-30, 70 A. 62 (1908) ("The law fixes no rule as to the order of this [corpus delicti] proof."). As we recently stated in *State* v. *Anonymous (83-FG),* 190 Conn. 715, 724-25, 463 A.2d 533 (1983): "It is not unusual to admit an exhibit into evidence before its relationship to the issues of a case

has been established. . . . This procedure may expedite the trial, and it is ordinarily not prejudicial because the exhibit may be stricken if the necessary evidentiary foundation is not eventually laid." (Citations omitted.) The same consideration applies in the present case. If a trial court concludes that there is insufficient, independent evidence tending to establish the corpus delicti, it can strike the defendant's admission. Leaving the issue of the order of presentation to the trial court's discretion is also the view of Professor Wigmore; 7 Wigmore, Evidence (Chadbourn Rev.) § 2073; whose definition of corpus delicti we adopted in *State* v. *Tillman,* 152 Conn. 15, 17, 202 A.2d 494 (1964). See also *Brinker* v. *District of Columbia,* 122 A.2d 768, 770 (D.C. 1956); *Commonwealth* v. *Smallwood,* 497 Pa. 476, 484, 442 A.2d 222 (1982) (order of proof of corpus delicti is within the realm of the trial court's discretion). The defendant in the present case has not demonstrated that the trial court abused its discretion regarding the order in which it admitted evidence.

We must also reject the defendant's claim that the fact that the court limited the state's case as to the manner in which the crimes were committed affected, in any way, the state's burden regarding the proof of the corpus delicti. This is because the purpose served by a bill of particulars (or, in this case, the long form information and affidavit) bears no relationship to the purpose served by the corpus delicti doctrine.

Pursuant to the corpus delicti doctrine in Connecticut, a defendant cannot be convicted solely on the basis of his confession; rather, there must be "independent evidence tending to establish the corpus delicti . . . ." *State* v. *Grant,* 177 Conn. 140, 144, 411 A.2d 917 (1979); see also *State* v. *Ruth,* 181 Conn. 187, 198, 435 A.2d 3 (1980); *State* v. *Tillman,* supra. In *Tillman,* we overruled prior case law and adopted the definition of cor-

pus delicti proposed by Professor Wigmore: "The corpus delicti consists of the occurrence of the specific kind of loss or injury embraced in the crime charged." Id., 20, citing 7 Wigmore, Evidence (3d Ed.) § 2072; see also *State* v. *Ruth,* supra. In an arson case, the corpus delicti is "the fact of burning, whether or not wilful"; 7 Wigmore, Evidence (Chadbourn Rev.) § 2072, pp. 527–28; and, under this reasoning, the corpus delicti of criminal mischief would be the damaged property. The purpose of this rule is to protect individuals from making precipitous confessions or admissions particularly where no crime has, in fact, been committed. See *Commonwealth* v. *Moore,* 466 Pa. 510, 513–14, 353 A.2d 808 (1976); see also 7 Wigmore, Evidence (Chadbourn Rev.) § 2072, p. 525; see generally *Opper* v. *United States,* 348 U.S. 84, 89–90, 75 S. Ct. 158, 99 L. Ed. 101 (1954).

The purpose of a bill of particulars (or, in this case, the long form information and affidavit) is entirely distinct from the issue of the veracity of a defendant's confession. "The function of the bill of particulars under Connecticut practice is to enable the defendant to obtain a more precise statement of the offense charged in the information in order to prepare a defense." *State* v. *Troynack,* 174 Conn. 89, 96, 384 A.2d 326 (1977); see also *State* v. *Roque,* 190 Conn. 143, 152, 460 A.2d 26 (1983). This information, in turn, allows a defendant to prepare adequately his defense and avoid prejudicial surprise. Id. Clearly, these concerns are totally unrelated to the veracity of a defendant's confession or statements. Therefore, regardless of the specificity of the long form information and affidavit in this case (or a bill of particulars, had the state been required to file one), this would not have affected the elements of the

corpus delicti that the state was required to prove by independent evidence as a requisite for introducing the defendant's statements.

We conclude that, given the definitions of the corpus delicti of arson and of criminal mischief as set out above, as well as the evidence which we have already set out, the state produced sufficient independent evidence tending to prove the corpus delicti of each crime to justify the admission of and reliance upon the defendant's statements. See *State* v. *Grant,* supra.

We next take up the defendant's claim that the trial court erred in allowing the state to introduce into evidence inculpatory statements contained on tape recordings that were made during an undercover police investigation. He presses three separate arguments as to why this evidence should have been excluded. First, he claims that the recording of his statements violated his fourth amendment rights. Second, he claims that the use of the tape recordings at the trial compelled him to give evidence against himself in violation of his fifth amendment right against self-incrimination and in violation of article first, § 8 of the Connecticut constitution.[10] Finally, he claims that it was error to play the tapes for the jury when only a small portion contained statements of his relating to the crimes with which he was charged, while the remainder presented him to the jury in a manner highly prejudicial to him. The state, on the other hand, contends that the constitutional claims lack merit. In urging us to reject his claim that the tape recordings should not have been presented in full to the jury, the state contends that his objection on appeal has taken on a new form. In doing so, it argues that at trial the defendant objected to the admission of the tapes in their entirety as being

---

[10] The Connecticut constitution, article first, § 8, provides: "No person shall be compelled to give evidence against himself . . . ."

prejudicial in that they contained references to his personal beliefs and to other uncharged crimes, whereas on appeal he casts his objection in terms of depicting a person of "serious character defects."

The constitutional claims lend themselves to summary treatment. In *United States* v. *White,* 401 U.S. 745, 91 S. Ct. 1122, 28 L. Ed. 2d 453, reh. denied, 402 U.S. 990, 91 S. Ct. 1643, 29 L. Ed. 2d 156 (1971), the United States Supreme Court said: "[A] police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa* v. *United States,* 385 U.S [293, 300–303, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966), reh. denied, 386 U.S. 940, 87 S. Ct. 970, 17 L. Ed. 2d 880 (1967)].[11] For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person; *Lopez* v. *United States,* [373 U.S. 427, 83 S. Ct. 1381, 10 L. Ed. 2d 462, reh. denied, 375 U.S. 870, 84 S. Ct. 26, 11 L. Ed. 2d 99 (1963)]; (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee* v. *United States,* [343 U.S. 747, 72 S. Ct. 967, 96 L. Ed. 2d 1270, reh. denied, 344 U.S. 848, 73 S. Ct. 5, 97 L. Ed. 659 (1952)]. If the conduct and revelations of an

---

[11] In *Hoffa* v. *United States,* 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966), reh. denied, 386 U.S. 940, 87 S. Ct. 970, 17 L. Ed. 2d 880 (1967), the defendant asserted that the admission into evidence of incriminating statements he made to a paid police informer violated the fourth, fifth and sixth amendments. The Supreme Court rejected each of these claims. See also *United States* v. *Gray,* 565 F.2d 881, 890 (5th Cir. 1978).

agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." *United States* v. *White,* supra, 751; see *State* v. *DeMartin,* 171 Conn. 524, 537–38, 370 A.2d 1038 (1976). The defendant argues that the mere consent of the police officer to monitor his conversations is not a ground for violating his (the defendant's) fourth amendment right because he himself did not consent to the monitoring. This argument fails because under *White,* once a police officer or agent of the police; see *Hoffa* v. *United States,* supra; consents to monitor an individual's conversation and that individual, as here, voluntarily talks with the officer, there is no fourth amendment protection.[12] See *United States* v. *Myers,* 692 F.2d 823, 859–60 (2d Cir. 1982); *United States* v. *Coven,* 662 F.2d 162, 173 (2d Cir. 1981); *United States* v. *Napolitano,* 552 F. Sup. 465, 483 (S.D.N.Y. 1982).

On his self-incrimination claim, the defendant argues essentially that he was "prodded" into making these statements and that they were not made voluntarily. Such an argument was rejected in *Andresen* v. *Maryland,* 427 U.S. 463, 475, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976), and in *Hoffa* v. *United States,* supra, 303–304. In *Andresen,* the court, drawing on *Hoffa,*

---

[12] In *Hoffa* v. *United States,* 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966), reh. denied, 386 U.S. 940, 87 S. Ct. 970, 17 L. Ed. 2d 374 (1967), the United States Supreme Court said: "Neither this court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa* v. *United States,* supra, 302. In *United States* v. *White,* 401 U.S. 745, 749, 91 S. Ct. 1182, 28 L. Ed. 2d 453, reh. denied, 402 U.S. 990, 91 S. Ct. 1643, 29 L. Ed. 2d 156 (1971), the United States Supreme Court referred to this language with approval.

pointed out that "although the accused's statements may have been elicited . . . for the purpose of gathering evidence against him, they were made voluntarily." *Andresen* v. *Maryland,* supra. We have examined the transcripts of all the tapes; we cannot conclude that the incriminating statements complained of "were the product of any sort of coercion, legal or factual." *Hoffa* v. *United States,* supra, 304; see *United States* v. *Peterson,* 522 F.2d 661, 665 (D.C. Cir. 1975). While the defendant may now argue that he misplaced his trust in talking as he did to the undercover police officer, an unguarded conversation is hardly the equivalent of an involuntary or compelled statement. *United States* v. *Gray,* 565 F.2d 881, 891 (5th Cir. 1978); *United States* v. *Peterson,* supra, 665–66; see generally *Fisher* v. *United States,* 425 U.S. 391, 400–401, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976).

His final claim is on the matter of playing all of the tapes for the jury rather than just those portions he contends were relevant to the crimes charged.[13] It would appear that this was not the objection he made at trial where it appears that he made a general objection that the admissions of the tape recorded conversations in their entirety would be unduly prejudicial. Because of our disposition of this appeal, we do not address this claim.[14] In doing so, we note that certain portions include statements concerning crimes of which he was found not guilty. We will not speculate as to the use to which these tapes may be put on the new trial we order and, therefore, it is wholly proper that

---

[13] In making this claim, he argues that the transcripts (which were exhibits in the trial court) are 124 pages in length and that no more than 20 pages of the transcript contain statements of his that are related to the crimes charged.

[14] In asking us to review this claim, the defendant also has not followed our rules of practice in presenting it for appellate review by setting it out in his brief in the manner required by Practice Book § 3060F.

the court at that time have an entirely free hand to determine any proffered utilization of any or all of them.[15]

It is unnecessary to discuss the remaining claims of error.

There is error, the judgment is set aside and the case is remanded for a new trial.

In this opinion the other judges concurred.

---

[15] We, therefore, need not reach the defendant's claim that the tapes, as admitted, were "unduly prejudicial," presenting him as a Nazi supporter, a racist, etc. We, however, point out that had the defendant made the objection he now makes for the first time on appeal, i.e., that the court excise those portions containing his remarks about Nazism, as well as ethnic and racial remarks, rather than the general objection to the tapes, the court could have ruled on precisely the issue he now raises. If this were done on retrial, then the trial court would be properly presented with the issue and then can determine if its prejudicial tendency outweighs its probative value. *State* v. *Ouellette,* 190 Conn. 84, 94, 459 A.2d 1005 (1983); *State* v. *Marquez,* 160 Conn. 47, 52, 273 A.2d 689 (1970). A proper objection at that time will facilitate a ruling that puts this delicate issue in its proper context.