STATE OF CONNECTICUT *v.* ROBERT RYERSON
(12698)

PETERS, C. J., SHEA, DANNEHY, CALLAHAN and STOUGHTON, Js.

Argued June 11—decision released September 2, 1986

*Sue L. Wise,* for the appellant (defendant).

*Roland D. Fasano,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

DANNEHY, J. The defendant, after a jury trial, was found guilty of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4). He was sentenced to imprisonment for fifteen years, with execution suspended after six years. On appeal the defendant claims that the trial court erred (1) in denying his motion to dismiss, and (2) in its instructions to the jury. We find no error.

On May 29, 1984, at approximately 4:40 p.m., the Bizarre Boutique Shop in West Haven was robbed. The owner of the boutique, Tina Nappi, testified that she was working in her store when a young man entered and asked for assistance in buying some clothes for his girlfriend. Nappi assisted the young man in selecting

a pair of slacks and a shirt. As Nappi rang up the sale, the young man grabbed her, stating, "Open the drawer. I have a gun. I'll blow your head off." The young man took approximately forty dollars and departed.

As the perpetrator was leaving the store, Nappi, according to a pre-arranged signal, banged on the wall behind her to alert an employee of the adjacent Postal Instant Press that she was being robbed. That employee, Dawn Chonko, looked out the front window and saw a small blue vehicle speeding out of the parking lot. Chonko informed investigating officers that the vehicle's license plate number was "4G1783," although she was unsure whether the first character was a "4," an "A" or a "V." Detective James McDonough of the West Haven police department, realizing that under the Connecticut vehicle registration system the first character would necessarily be a letter, submitted twenty-six different alphabet combinations to the department of motor vehicles. The combination "VG-1783" came back as the registration number assigned to a blue 1980 Toyota Corolla owned by Maureen Murphy of North Haven. At approximately 8:30 p.m. that same evening, McDonough interviewed Maureen Murphy, who stated that she had loaned her car to the defendant at approximately 12 p.m., and that she had been expecting it back by 3 p.m. The car had as yet not been returned, and Murphy had not heard from the defendant.

Nappi, who earlier that day had spent approximately fifteen minutes assisting the young man in the boutique before the robbery, gave McDonough a detailed physical description of the robber.[1] McDonough compared

---

[1] Tina Nappi described the perpetrator as a white male, approximately twenty-five years old, 5 feet, 10 inches tall, slender with a muscular build, with light brown or sandy blond hair and mustache, freckles or light acne on his face, a small turned up nose, and a clean cut, collegiate look. His eyes seemed glassy and bloodshot. He wore a blue jacket, windbreaker type, a green polo style shirt with small horizontal stripes, and a painter's style cap, off-white with a logo or emblem on the front.

Nappi's description of the defendant with that given by Murphy, and found the two to be "consistent." McDonough also acquired information that the defendant had been at his former place of employment, the Holistic Health Center, in Orange, at approximately 3 p.m. that day. The health center is located on the same road as the boutique, approximately two miles away. McDonough learned from Murphy that the defendant was presently employed as a door person at a nearby pub. McDonough called the pub, and the manager informed him that the defendant had not reported for work that evening. The defendant was supposed to have reported for work at 9 p.m. Finally, McDonough was informed by the New London police department that the defendant had recently completed a sentence of imprisonment for committing a number of convenience store robberies.

At 1:35 a.m. the following morning, police spotted Murphy's blue Toyota in the driveway of the defendant's residence in North Haven. McDonough at the time was in the process of typing a warrant for the defendant's arrest. McDonough testified that he decided to arrest the defendant without a warrant because "otherwise [he] would have to go find a prosecutor and a judge and everything." Nonetheless, McDonough testified that prior to leaving headquarters that morning he had determined that he would knock on the defendant's door and arrest him only if he answered it, but that if the defendant refused to answer the door, McDonough would have the house surrounded by fellow officers while he went to obtain a warrant.

Thus, with the intention of arresting the defendant without a warrant should the opportunity present itself, McDonough and a cadre of officers from both the West Haven and North Haven police departments went to the defendant's residence, at approximately 2 a.m. on the morning of May 30, 1984. The defendant's resi-

dence was a small converted farmhouse approximately 300 feet from the road. Police officers surrounded the house as McDonough drove up the driveway with his lights off. The front door to the house was unlocked, and McDonough, accompanied by two officers, walked in. Through the front door the officers entered a hallway, with two doors leading to the first floor apartment, and a staircase leading to the defendant's upstairs apartment, all of which McDonough knew from a previous visit several hours before. McDonough walked up the stairway to the defendant's apartment, leaving the other two officers at the base of the stairs. McDonough knocked on the door, identified himself, and said, "Bob, can you open the door?" The defendant responded, "Wait a minute, can I go to the bathroom first?" McDonough said, "No, could you open the door first, we would like to talk to you." When the defendant then opened the door, McDonough showed him his badge and asked him to identify himself. The defendant stated his name, and McDonough immediately placed him under arrest. The time was 2:30 a.m.

I

We first address the defendant's claim that the trial court erred in denying his motion to dismiss. The defendant claimed in the trial court that his warrantless, predawn arrest in his apartment was unconstitutional, and that under *State* v. *Licari,* 153 Conn. 127, 214 A.2d 900 (1965), the charges against him should have been dismissed. The trial court denied the motion, and the defendant renewed his claim under *State* v. *Licari* in his initial brief to this court. After that brief had been filed, we overruled *Licari* in *State* v. *Fleming,* 198 Conn. 255, 257–63, 502 A.2d 886 (1986). Thereafter, we permitted the parties to file supplemental briefs to address the application of *Fleming* to the circumstances of this case.

In *State* v. *Fleming,* supra, 263, we held that "[w]here the fairness of a subsequent prosecution has not been impaired by an illegal arrest, neither the federal nor the Connecticut constitution requires dismissal of the charges or a voiding of the resulting conviction." An illegal arrest may impair the fairness of a subsequent prosecution only where *evidence* obtained as a direct consequence of that arrest is admitted against the defendant at trial. Id., 262; *State* v. *Federici,* 179 Conn. 46, 425 A.2d 916 (1979). In the present case the defendant concedes that the police obtained no evidence as a direct consequence of his arrest, and thus, that no "fruits" of that arrest were admitted into evidence against him. It would therefore appear that under *Fleming* the defendant's motion to dismiss was properly denied, irrespective of the constitutionality of his arrest.

The defendant contends, however, that the methods employed by police to effectuate his arrest in this case require that his charges be dismissed. In urging an exception to our holding in *Fleming,* the defendant notes that the arrest was made at 2:30 a.m., in his apartment, and by a cadre of officers from two different police departments. He also notes the absence of exigent circumstances to justify the failure of the police to obtain a warrant: McDonough by his own admission would have gone to obtain a warrant had the defendant not answered his door. "It is these egregious circumstances," he contends, "which cry out for judicial intervention which will not leave our citizenry powerless in the face of unrestrained police power."

While we may not condone the methods employed by the arresting officers in this case, neither are we persuaded that the charges brought against the defendant should have been dismissed. The interests of justice demand that those accused of committing serious crimes at least be brought to trial. We do not believe

that a bar against prosecution of this defendant would advance and not impair the legitimate state interest in bringing criminals to justice, and we must therefore reject the defendant's claim that the circumstances of this case warrant an exception to *Fleming.*

The defendant also claims that our decision in *Fleming* should not be applied retroactively. This claim is plainly without merit. "As a rule, judicial decisions apply 'retroactively.' *Robinson* v. *Neil,* 409 U.S. 505, 507–508, 93 S. Ct. 876, 35 L. Ed. 2d 29 (1973). Indeed, a legal system based on precedent has a built-in presumption of retroactivity." *Solem* v. *Stumes,* 465 U.S. 638, 642, 104 S. Ct. 1338, 79 L. Ed. 2d 579 (1984). " 'If a "new" constitutional doctrine is truly right, we should not reverse lower courts which have accepted it; nor should we affirm those which have rejected the very arguments we have embraced.' " *United States* v. *Johnson,* 457 U.S. 537, 555, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982), quoting *Desist* v. *United States,* 394 U.S. 244, 259, 89 S. Ct. 1030, 22 L. Ed. 2d 248 (1969) (Harlan, J., dissenting).

It is clear that "[c]omplete retroactive effect is most appropriate where a new constitutional principle is designed to enhance the accuracy of criminal trials." *Solem* v. *Stumes,* supra, 642; see *Brown* v. *Louisiana,* 447 U.S. 323, 100 S. Ct. 2214, 65 L. Ed. 2d 159 (1980); *Hankerson* v. *North Carolina,* 432 U.S. 233, 97 S. Ct. 2339, 53 L. Ed. 2d 306 (1977). Indeed, the defendant notes that we refused to accord retroactive effect to our decision in *State* v. *Licari* precisely because the *Licari* rule did not contribute to the " 'fairness of the trial' " or to the " 'integrity of the fact-finding process.' " *Reed* v. *Reincke,* 155 Conn. 591, 601, 236 A.2d 909 (1967), citing *Linkletter* v. *Walker,* 381 U.S. 618, 639, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965). The defendant argues that the new rule announced in *Fleming,* overruling

*Licari,* is similarly not designed to enhance the accuracy of the trial, and thus, that it should not be given retroactive effect.

We think that the defendant misconceives the nature of the exception to the general rule of retroactivity as applied in *Reed* v. *Reincke,* supra. When a new decision enlarges the constitutional rights of criminal defendants by overruling established precedent, the justifiable "reliance by law enforcement authorities on the old standards," and the potentially disruptive "effect on the administration of justice by retroactive application of the new standards"; *Stovall* v. *Denno,* 388 U.S. 293, 297, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967); *Solem* v. *Stumes,* supra, 643, 645–46; may militate against retroactive application of the new rule. When a later decision restricts the rights of the accused, however, the reliance factor is absent. In the present case, for example, it cannot be argued that the defendant ordered his conduct in justifiable reliance on our decision in *Licari.* On similar reasoning, federal courts considering the issue have given retroactive effect to *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), as providing the appropriate standards to decide the validity of searches conducted before the date of the *Gates* decision. *United States* v. *Swingler,* 758 F.2d 477, 487 (10th Cir. 1985); *United States* v. *Coronel,* 750 F.2d 1482, 1486 (11th Cir. 1985); *United States* v. *Little,* 735 F.2d 1049, 1054 (8th Cir. 1984); *United States* v. *Estrada,* 733 F.2d 683, 685 (9th Cir. 1984); *United States* v. *Mendoza,* 727 F.2d 448, 449–50 (5th Cir. 1984); see also *United States* v. *Sager,* 743 F.2d 1261, 1263–65 (8th Cir. 1984) ("good faith" exception to exclusionary rule applied retroactively). We noted in *Fleming* that the *Licari* decision was "expressly derived from a misunderstanding" of federal caselaw. *State* v. *Fleming,* supra, 260. There is no reason to perpetuate that misunderstanding by refusing retroactive effect to what

has always been a correct statement of law. *Fleming himself* was not entitled to a dismissal of charges based on the alleged illegality of *his* arrest. The defendant in the present case, whose arrest occurred nearly four years after Fleming's, can fare no better. We therefore hold that *Fleming* is to be applied retroactively and that the trial court properly denied the defendant's motion to dismiss.

## II

We next address the defendant's assorted claims that the trial court erred in its charge to the jury. The defendant first claims that the trial court erroneously refused his request to charge the jury that "[p]roof beyond a reasonable doubt means that the State must convince each juror to a subjective state of near certitude of the guilt of the accused. If you are not convinced in your mind to a mental state of near certitude of the guilt of the accused, then the State has not convinced you beyond a reasonable doubt." As authority for his request to charge the defendant relied on *State* v. *DelVecchio,* 191 Conn. 412, 419, 464 A.2d 813 (1983), in which we quoted *Jackson* v. *Virginia,* 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979), for the observation that " 'by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself.' " The defendant contends that the "near certitude" language quoted above has been "adopted" by the United States Supreme Court, and by this court, and hence is a required instruction to the jury in a criminal case. We disagree.

In attempting to elucidate in finer detail the transcendent aims of our criminal justice system, we did

not intend, in *State* v. *DelVecchio,* supra, to issue an edict for a new jury instruction required in all future criminal cases. Nor do we think that our use of language in *State* v. *DelVecchio,* or that of the United States Supreme Court in *Jackson* v. *Virginia,* is reasonably susceptible to interpretation as mandating a new jury instruction. In *DelVecchio,* the trial court in its charge to the jury had analogized the state's burden of proof to various yardlines on a football field, ultimately instructing the jury, "[y]ou got to go somewhere, I suppose, beyond the fifty yard line; where it is in there is up to you to decide." *State* v. *DelVecchio,* supra, 418. We discussed the reasonable doubt standard only insofar as was necessary to explain why such an analogy was inappropriate, and why the instruction would constitute reversible error. We also noted, however, that " '[a]ttempts to explain the term "reasonable doubt" do not usually result in making it any clearer to the minds of the jury' "; id., 420, quoting *Miles* v. *United States,* 103 U.S. 304, 312, 26 L. Ed. 481 (1881); and that " 'judicial attempts to clarify the meaning of the phrase "reasonable doubt" by explanation, elaboration or illustration . . . more often than not tend to confuse or mislead.' " *State* v. *DelVecchio,* supra, quoting *United States* v. *Pinkney,* 551 F.2d 1241, 1244 (D.C. Cir. 1976). We intended no more that these extractions be theretofore incorporated into jury instructions than we did the "near certitude" language proposed by the defendant in his request to charge.

In the present case the trial court instructed the jury in accordance with the standard charge on reasonable doubt.[2] The defendant's burden with respect to this claim of error is thus " 'especially heavy because no

---

[2] "The law says that the State must not only prove him guilty but must prove him guilty beyond a reasonable doubt. It is not enough for the State to make out a case of probable guilt, but the burden on the State, which never shifts, is to prove the accused guilty beyond a reasonable doubt. It

erroneous instruction was given.' " *State* v. *Kurvin,* 186 Conn. 555, 563, 442 A.2d 1327 (1982), quoting *Henderson* v. *Kibbe,* 431 U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977). We have stated many times that although a legally accurate and properly submitted request to charge should be accepted by the trial court, the refusal to do so is not a ground for reversal if the substance of the request is adequately conveyed to the jury in other portions of the charge. *State* v. *Shindell,* 195 Conn. 128, 143, 486 A.2d 637 (1985); *State* v. *Gabriel,* 192 Conn. 405, 418, 473 A.2d 300 (1984); *State* v. *Falcone,* 191 Conn. 12, 26, 463 A.2d 558 (1983); *State* v. *Cooper,* 182 Conn. 207, 211, 438 A.2d 418 (1980); *State* v. *Maresca,* 173 Conn. 450, 460, 377 A.2d 1330 (1977); *State* v. *Bennett,* 172 Conn. 324, 330, 374 A.2d 247 (1977); *State* v. *Avila,* 166 Conn. 569, 574,

---

is not required that the State prove the defendant guilty beyond all possible doubt. The obligation is to prove his guilt beyond all reasonable doubt.

"A reasonable doubt means this: It is a doubt for which a reasonable person can give a valid reason. The burden of proving his guilt beyond a reasonable doubt requires the State to produce sufficient evidence to create in your minds a strong and abiding conviction of the guilt of the accused. In other words, it is the law that the evidence must be so sufficient that it would leave no room in your mind for any reasonable hypothesis of the innocence of the accused. A reasonable doubt is not a doubt raised by one who questions for the sake of raising a doubt. A reasonable doubt is not a surmise or speculation, conjecture or an imaginary doubt. A reasonable doubt is not a captious or frivolous doubt, nor a doubt which is raised by the ingenuity of counsel or by a juror and unwarranted by the evidence, nor is it a doubt prompted by sympathy for the accused. A reasonable doubt is a real doubt, and an honest doubt, a doubt which has its foundation in the evidence offered in the case or lack of evidence.

"Absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty to authorize a conviction. What it does require is that the guilt be established, as charged, beyond a reasonable doubt, which is one founded upon the evidence, one which you, as reasonable and prudent men and women, would be willing to act upon in the more weighty and important matters relating to your own affairs. It is proof wholly consistent with the defendant's guilt and inconsistent with any other rational conclusion. If, upon any reasonable hypothesis, the evidence warrants a construction favorable to the accused, he is entitled to it and must be given the benefit of it by you, as his triers."

353 A.2d 776 (1974). While the defendant's request in this case did not contain an inaccurate statement of law, we believe that the standard charge on reasonable doubt as given by the trial court adequately conveys the degree of certitude required of the jury in order to return a guilty verdict. The trial court did not err in refusing the defendant's request to charge.

The defendant also claims that the trial court erred in refusing his request to charge on the unreliability of eyewitness identification. In particular, the defendant argues that the "unreliability" instruction should have been given with respect to the identification testimony of Nappi, the robbery victim. On the evening of May 30, 1984, Nappi had been shown a photographic array containing a black and white photograph of the defendant taken earlier that day during processing at the West Haven police department. Although Nappi was positive in her description of the perpetrator, she only tentatively identified the defendant's photograph in the array because she thought that the perpetrator had been a little thinner and that his nose had not been as wide as appeared in the defendant's photograph. When she asked if there were any other photographs to view, McDonough had produced four color photographs of the defendant taken by the New London police department in 1983. Nappi immediately identified the defendant from the color photographs, and McDonough then informed her that the black and white photograph she had tentatively identified from the array depicted the same person as did the color photographs from which she had identified the defendant. The trial court found that the photographic identification procedure was unnecessarily suggestive, but not unreliable. It therefore denied the defendant's motion to suppress Nappi's out-of-court identification of the defendant. See *State* v. *Parker,* 197 Conn. 595, 598, 500 A.2d 551 (1985); *State* v. *Austin,* 195 Conn. 496,

499, 488 A.2d 1250 (1985); *State* v. *Fullwood,* 193 Conn. 238, 243–44, 476 A.2d 550 (1984). At trial, Nappi was permitted to testify as to the circumstances surrounding the out-of-court identification, and she also made an identification in court.

The defendant filed an appropriate request to charge based on language taken from *Simmons* v. *United States,* 390 U.S. 377, 383–84, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), and quoted with approval by this court in *State* v. *Tinsley,* 181 Conn. 388, 393–94, 435 A.2d 1002 (1980), cert. denied, 449 U.S. 1086, 101 S. Ct. 874, 66 L. Ed. 2d 811 (1981).[3] The defendant contends that the finding by the trial court that the identification procedure was unnecessarily suggestive would strongly

[3] The defendant's request to charge provided in part: "Dangers of suggestion, that is circumstances which draw attention to a particular person exist in any identification procedure. However, the suggestion used by the police may be so great that the witness identified someone, before trial, who is not in fact the person who committed the act charged. In determining the credibility of the witness' identification, therefore, you may consider whether the identification procedure contained any elements of suggestion that would have a tendency in reason to affect the reliability of the identification. 'It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying . . . . Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent in-court identification.'

"AUTHORITY: *Simmons* v. *United States,* 390 U.S. 377, 88 S. Ct. 967 [19 L. Ed. 2d 1247] (1968); *United States* v. *Fernandez,* 456 F.2d 638 (2d Cir. 1972) (Friendly, C. J.); *State* v. *Tinsley,* 181 Conn. 388 [435 A.2d 1002] (1980); *State* v. *Harden,* 175 Conn. 315 [398 A.2d 1169] (1978)."

support his request to charge on the unreliability of identification testimony. While we tend to agree with the defendant, we would also note that the trial court found, under the totality of the circumstances, that Nappi's identification had been reliable. Since the defendant has not challenged the denial of his motion to suppress the pretrial identification, we must conclude for purposes of review that Nappi's identification of the defendant was reliable. Thus, despite the fact that the reliability of Nappi's identification had cured the suggestivity of the procedure, the trial court instructed the jury that it might consider "the circumstances of [the] earlier identification procedure . . . in determining the reliability of the witness' identification which was made in the courtroom." Viewing the charge as a whole, we believe that the substance of the defendant's request to charge was adequately conveyed to the jury.[4] *State* v. *Shindell,* supra. We therefore find no

[4] The trial court charged as follows: "Now, one of the primary issues in this case is the identification of the defendant as the perpetrator of the crime alleged here. The State has the burden of proving identity beyond a reasonable doubt. It's not essential that the witnesses themselves be free from doubt as to the correctness of their identification. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of an accused before you can convict him. If you are not convinced beyond a reasonable doubt that the defendant, Robert Ryerson, was the person who committed the offense, then you must find him not guilty.

"A witness' opportunity to observe the perpetrator during the commission of the act charged is of great importance in determining the credibility of her identification, as are other factors about which I shall instruct you shortly. The testimony of the witness that she is positive of her identification may be considered by you, but it does not relieve you of the duty to carefully consider her identification testimony and to reject it if you find that it is not reliable.

"Now, there has been testimony about an identification procedure in this case involving photographs. Where evidence has been introduced that a witness who has identified the defendant at trial has identified him on another occasion before trial, the circumstances of that earlier identification procedure may be considered by you in determining the reliability of the witness' identification which was made in the courtroom. Identification testimony is an expression of belief or impression by the witness. Its

error in the trial court's denial of the defendant's request to charge on the unreliability of eyewitness identification.

The defendant next contends that the trial court erred in charging the jury on alibi witnesses. Scott Weins, the defendant's former employer at the Rustic Oak Restaurant in North Haven, testified that the defendant had been with him at the restaurant from 4:40 p.m. until 5 p.m. on May 29, 1984, when the robbery of the Bizarre Boutique allegedly occurred. The trial court charged the jury that "frequently, evidence relating to a claimed alibi will consist of testimony of a witness or witnesses who are friends of or associates of the accused and who may, therefore, be held to be, in a greater or lesser degree, interested. Liability of the human mind to make honest mistakes as to dates or hours of the day or night when certain events occurred is often noted. Interested persons sometimes jump very quickly to the time of an occurrence when

value depends on many factors which are involved in the process of identification by an eyewitness. In assessing the reliability of the identification, you should consider the following: Did the witness have an adequate opportunity to observe the offender? Did the witness have the physical or emotional capacity to accurately observe the defendant? How accurate was the witness' original description of the perpetrator? How long a time passed between the crime and the time the witness first identified the accused? Are you satisfied that the identification made by the witness was a result of her memory? You may also take into account the strength of the identification and the circumstances of the identification. You must consider the credibility of the identification witness in the same way as any other witness. Consider whether she is truthful, whether she had the opportunity and the capacity to make reliable observation on the matters covered in her testimony.

"I emphasize, once again, that the burden of proof on the prosecutor extends to every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged. If, after examining the testimony, you have a reasonable doubt as to the accuracy and reliability of the identification, then you must find the defendant not guilty."

such a time would be favorable to some desirable end, or persons may, at a later date, be led to mistake when memory is no longer certain with respect to the day or the hour of the day." The defendant took a proper exception to this portion of the charge.

" 'On numerous occasions this court has stated that the trial court in a criminal case may, in its discretion, make fair comment on the evidence and particularly on the credibility of witnesses. See *State* v. *Tropiano,* 158 Conn. 412, 428, 262 A.2d 147 [1969]; *State* v. *LaFountain,* 140 Conn. 613, 620, 103 A.2d 138 [1954]; *State* v. *Pecciulis,* 84 Conn. 152, 158, 79 A. 75 [1911]. In addition, we have also declared that an instruction on the credibility of alibi witnesses similar to that challenged by this assignment of error is both proper and fair when weighed in the light of the other paragraphs of the charge. *State* v. *Groos,* 110 Conn. 403, 410, 148 A. 350 [1930]; *State* v. *Cianflone,* 98 Conn. 454, 466, 120 A. 347 [1923] . . . . It is well recognized that the credibility of alibi witnesses is a subject as to which fair comment by the court to the jury is allowed. See *Sullivan* v. *Scafati,* 428 F.2d 1023 (1st Cir. [1970]), cert. denied, 400 U.S. 1001, 91 S. Ct. 478, 27 L. Ed. 2d 452 [1971]; *Surridge* v. *State,* 239 Ark. 581, 393 S.W.2d 246 [1965]; *Commonwealth* v. *Sullivan,* 354 Mass. 598, 239 N.E.2d 5 [1968], cert. denied, 393 U.S. 1056, 89 S. Ct. 697, 21 L. Ed. 2d 698 [1969]; *State* v. *Griffin,* 336 S.W.2d 364 (Mo. [1960]); *Commonwealth* v. *Gates,* 392 Pa. 557, 141 A.2d 219 [1958]; *Rogers* v. *State,* 455 S.W.2d 182 (Tenn. Crim. App. [1970]); *Bolin* v. *State,* 219 Tenn. 4, 405 S.W.2d 768 [1966].' " *State* v. *Bennett,* 172 Conn. 324, 329–30, 374 A.2d 247 (1977), quoting *State* v. *Cari,* 163 Conn. 174, 182, 303 A.2d 7 (1972); see also *State* v. *Stepney,* 191 Conn. 233, 246–49, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984); *State* v. *Jonas,*

169 Conn. 566, 577–78, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976); *State* v. *Malley,* 167 Conn. 379, 382, 355 A.2d 292 (1974). "We find no error in this portion of the charge to the jury." *State* v. *Bennett,* supra, 330.

The defendant's final claim is that the trial court erred in giving the "Chip Smith" charge under the circumstances of this case. The defendant has not identified those circumstances in his brief. In any event, when the jury reported for the second time that it was unable to reach a verdict, the trial court gave the jury the "Chip Smith" charge.[5]

Since *State* v. *Smith,* 49 Conn. 376, 386 (1881), the "Chip Smith" charge has consistently been upheld by this court. Only recently, in *State* v. *O'Neill,* 200 Conn. 268, 281–84, 511 A.2d 321 (1986), we upheld the charge

---

[5] "Ladies and gentlemen of the panel, your note reads that you remain at an impasse; it appears impossible to reach a unanimous verdict. Under these kind of circumstances—This is not the first time, of course, this has occurred in the trial of a case; and under these circumstances, when the jury indicates what you have indicated in that note, rather than terminating the proceedings, I wish to give you further, additional instructions and ask you to return and to resume your deliberations. Now, although the verdict to which each juror agrees must, of course, be his or her own conclusion and not a mere acquiescence in the conclusions of his fellows, yet in order to bring six minds to a unanimous result, the jurors should examine with candor the questions submitted to them and with due regard and deference to the opinions of each other. In conferring together, the jury ought to pay proper respect to each other's opinions and listen with candor to each other's arguments. If much the larger number of the panel are for conviction, a dissenting juror should consider whether the doubt in his or her mind is a reasonable one which makes no impression upon the minds of so many other men and women equally honest, equally intelligent and who have heard the same evidence, with the same attention, and with equal desire to arrive at the truth, and under the same sanction of the same oath. On the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to, doubt the conclusion of a judgment which is not concurred in by most of those with whom they are associated on the jury and distrust the weight or sufficiency of that evidence which fails to carry conviction in the minds of their fellows."

against constitutional attack and ratified its continuing validity. The charge as given by the trial court in this case was not slanted in favor of either the state or the defendant, and on the whole, we think that it was quite fair. We therefore reject the defendant's claim of error based on the "Chip Smith" charge.

There is no error.

In this opinion the other justices concurred.