**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Telmo CORONEL, Rosa Coronel, Federico Aras, Isaias Rojas and Carlos Vargas, Defendants-Appellants.**

No. 83–5674.

United States Court of Appeals,
Eleventh Circuit.

Jan. 21, 1985.

Nurik, O'Donnell, Lazarus & Grillo, John F. O'Donnell, Fort Lauderdale, Fla., for Telmo and Rosa Coronel.

Entin, Schwartz, Dion & Sclafani, Ronald A. Dion, North Miami Beach, Fla., for Carlos Vargas.

Kirk W. Munroe, Coral Gables, Fla., for Federico Aras.

Joel N. Rosenthal, Miami, Fla., for Isaias Rojas.

Chris Mancino, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, HILL, Circuit Judge, and PECK [*], Senior Circuit Judge.

GODBOLD, Chief Judge:

The five appellants plus two other defendants were convicted of conspiracy, possession with intent to distribute cocaine, and manufacture of cocaine.[1] The case arises from a raid on a farm in a rural area on the outskirts of Miami in south Dade County. The defendants are:

Orozco: His corporation owned the farm. He purchased materials used in the manufacture of cocaine, took them to the farm, and unloaded them. Later he was arrested as he entered the farm just as the raid began. He was tried in absentia and is a fugitive.

Carmen Aras: Orozco's daughter. Arrested with him entering the farm as the raid began. Also a fugitive.

Federico Aras and Rojas: Both arrested standing in the chicken house.

Vargas: Found crouched beside an incubator containing drying cocaine, located in the incubator shed off the chicken house.

All convictions are affirmed.

---

[*] Honorable John W. Peck, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. 21 U.S.C. §§ 846 and 841(a)(1).

## I. FACTS

On October 29, 1982 informant Hoch notified DEA Agent Sennett that Potpourri Company had ordered from the informant's employer a quantity of ether, a precursor chemical. On November 2 Sennett observed the ether delivered to Potpourri. A truck was at Potpourri at the time and left there with the odor of ether emanating from it. Later this truck was located at the farm, 18850 Southwest 248th Street, Miami.

The next day Hoch tipped Sennett that Potpourri had ordered acetone and sulfuric acid. Sennett saw these items delivered to Potpourri and observed several cans of the acetone being loaded into the same truck that he had seen the previous day. DEA agents followed the truck to 18850 Southwest 248th Street, and saw the truck on the premises, and Sennett saw the driver unloading the containers of acetone into a shed on the property.

On November 4 Hoch notified Sennett that a third order had been placed, this time for ammonium hydroxide, potassium permanganate, and filter paper, again to be sent to Potpourri. The following day, according to Hoch, he met with the driver of the truck (that had picked up the two observed loads). The driver requested that Hoch help him process coca base into cocaine hydrochloride, gave Hoch a sample, and told him that he had a remote location "down south" to process the material. Hoch delivered the sample to Sennett, and it tested positive for cocaine. Sennett then placed the premises at 18850 Southwest 248th Street under surveillance. He saw the same truck there, and he saw the truck driver, later identified as Orozco, on the property moving from shed to shed while carrying five gallon cans similar to the containers of acetone.

The farm contains a main house, chicken house, chicken shed, incubator shed, and a pump house, grouped closely together. A fence with a locked gate surrounds the premises. There are farm animals and birds on the farm, but there is no chicken-raising operation.

The Coronels occupy the main house. Utility bills are paid by Telmo Coronel. Orozco's corporation owns the farm.

The government secured a search warrant based on an affidavit by Sennett. Sennett's affidavit describes the information set out above. It describes Hoch, who is unnamed, as a "concerned citizen" and a "legitimate businessman."

When the raid took place, Orozco and Carmen Aras were arrested at the front gate. The Coronels ran from the back of the house into a field and were arrested. In the chicken shed, where Federico Aras and Rojas were arrested, was a Buchner funnel, a type used in cocaine preparation, with filter paper on it containing cocaine. A supply room in the back of the chicken shed contained a stainless steel gas regulator and sulfuric acid, items necessary to the manufacture of cocaine. Also in the supply room was a blue suitcase, which contained packaged cocaine and the passports of Federico Aras and Rojas. Other items in the shed included miscellaneous glassware, beam scales, other chemicals and equipment used for chemical processing, and airline tickets to Bolivia made out to Federico Aras, Carmen Aras and Rojas.

Vargas was found in the incubator shed crouched behind the incubator and attempting to conceal himself. The incubator was in operation, and inside were approximately six kilos of cocaine drying. It was visible through open windows. The door of the shed was propped open, and an odor of cocaine emanated from it.

## II. THE SEARCH WARRANT

Before trial, the Coronels, Federico Aras and Rojas joined in a motion to suppress and moved for a *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) hearing. The court heard lengthy arguments by counsel but did not take evidence, and denied the motion to suppress and the request for evidentiary hearing. The court correctly ruled that the Coronels have standing. Federico Aras and Rojas do not have standing.

*Franks* held that where a defendant makes a substantial preliminary showing that a false statement made knowingly and intentionally and with reckless disregard for the truth is included by affiant in an affidavit for a search warrant, and the alleged false statement is necessary to the finding of probable cause, a hearing must be held at defendant's request so that he may challenge the truthfulness of factual statements made in the affidavit.

■ The basis for the motion is that the affidavit falsely described the unnamed third person (Hoch) as a "concerned citizen" and "legitimate businessman." According to the movants, the following facts existed. Hoch had been convicted several years previously in state court for delivering PCP. He was suspected of supplying precursor chemicals to illegal laboratories. He was a cocaine user. He had been given the choice by Agent Sennett of cooperating in the investigation or of being a potential defendant and the focus of an IRS investigation. His company was listed in DEA records for narcotics trafficking. He was paid $1,000 by Sennett in DEA funds. Eventually he had been given a formal informant's number.

We assume for purposes of discussion that movants' description of Sennett's relations with Hoch satisfied the first prong of *Franks*, and turn to the second prong. The description of Hoch as "concerned citizen" and "legitimate businessman" has little if any significance insofar as it bears directly upon Hoch's own reliability. There is no substantial contention that what Hoch said to Sennett was inaccurate; according to Sennett the tips given by Hoch were precisely accurate. Rather the alleged misdescription is relevant to Sennett's credibility. Defendants say that because Sennett misstated the status of Hoch, Sennett is not believable, either as a relator of what he says Hoch had told him or as a describer of his own activities (which activities, if accurately stated, both corroborated what Hoch had said and described events participated in by Sennett that independently bore on probable cause).

But the details in the affidavit that were said by Sennett to have come to him from Hoch, and the details said by Sennett to have originated from himself, and the details arising from other DEA agents, all fit together. Sennett says that Hoch tipped him to two deliveries to Potpourri. Sennett says that he saw both deliveries, each in the exact number and size of containers as described by Hoch. Sennett says that Hoch told him the first delivery was of ether. Sennett says he himself smelled ether. Sennett says that he himself saw materials from the second load unloaded at the farm, and he himself saw five gallon cans moved around on the premises, and himself smelled ether at the premises. Sennett says that Hoch delivered to him a sample of coca base that was delivered to Hoch by the driver of the truck. Sennett says he delivered this sample to the DEA laboratory where it tested positive for cocaine. Sennett says, with respect to the first delivery, that "DEA agents" (in view of the plural, necessarily others than Sennett, or Sennett plus at least one other) followed the truck to the farm. Sennett says that he determined from a named DEA chemist that all the chemicals and equipment involved in the orders described by Hoch were necessary to the process of converting coca base to cocaine hydrochloride. Sennett says Hoch told him the driver said the laboratory was "down south." Sennett says he and other DEA agents traced the deliveries to a South Dade address. Sennett says that he checked the Dade County property records and found that the farm was owned by a corporation, the registered agent of which was Ortelio Arcia; he checked through the DEA computer and it showed Arcia to be a narcotics trafficker.

Thus, Sennett's story, related in the affidavit, was facially true and correct or it was an overall web of falsehood that swept in not only what Sennett said Hoch said, and what Sennett said he himself did, but the statements and activities of others as well. In this context the misdescription of Hoch meant little if anything. If Hoch's status had not been described at all, the

affidavit still would have been more than sufficient for probable cause. *See Doescher v. Estelle*, 666 F.2d 285, 288 (5th Cir. 1982). The incorrect statement was not necessary to the finding of probable cause.[2]

The ultimate thrust of defendants' argument is that if an affiant makes any knowing and intentional, or reckless, statement in his affidavit, his credibility is rendered so suspect with respect to everything else in the affidavit that there must be a hearing. This would subsume the *Franks* principle in every single-affidavit case.

### III. THE PASSPORTS

Federico Aras and Rojas were arrested in the chicken house. In the storage shed, opening onto the chicken house, officers found a blue suitcase containing cocaine in which, officer Sennett testified, the passports of these two defendants and of Carmen Aras were also found. The passports tended to link these two defendants in a physical sense, with cocaine. In opening statement the government referred to the passports. Counsel for Federico Aras and Rojas had not yet stated to the jury any theories of defense. Federico Aras interrupted and moved for a mistrial because the passports had not been revealed or produced pursuant to the court's standing discovery order. The prosecutor stated that the omission was unintentional and that he was not aware of the existence of the passports until told by the case agent on the day of the trial. The court recessed early in order that counsel for Federico Aras could consider the effect of the passports and could discuss them with his client. The next morning Federico Aras moved to exclude the passports or alternatively for a mistrial or a two weeks continuance. After oral argument, the court held there was no prejudice from the late revelation of the passports.

A standing discovery order had been entered at arraignment December 1, 1982. The government was obligated to produce within seven days documents, papers, and other items that it intended to introduce or had obtained from the defendant. Inspection was arranged between counsel for Aras and the government and occurred December 28, 1982. The trial began August 1, 1983.

Federico Aras contends that he was prejudiced, asserting:

(1) It is uncertain whether the passports actually were in the suitcase. Photographs taken of the suitcase show only cocaine.

(2) The only three items seized that were not on the search warrant inventory were the passports, air tickets, and photos that had been taken from Carmen Aras's purse; because all were treated alike it can be inferred that all were taken from her purse at arrest. Carmen Aras, daughter of Federico, had absconded at time of trial, but, if the passports had been timely revealed it might have been possible to find out from her whether they had been taken from her purse and who might know this fact.

(3) Testimony is needed from agents at the scene who may know whether the passports came from the suitcase.

(4) The government contended that an identity card of Federico Aras was with his passport and attached to it. Federico Aras says the card was seized from his wallet by "a little short agent who spoke Spanish" and who is not Sennett.

■ We consider the reason for the failure to disclose, the extent of the prejudice,

---

**2.** The standards for the issuing magistrate are set out in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The magistrate must make a

> practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.,* 103 S.Ct. at 2332. This court has impliedly held *Illinois v. Gates* retroactive. *U.S. v. Betancourt,* 734 F.2d 750 (11th Cir.1984); *U.S. v. Haimowitz,* 712 F.2d 457 (11th Cir.1983). Other courts have expressly so held. *U.S. v. Sager,* 743 F.2d 1261 (8th Cir.1984); *U.S. v. Barbin,* 743 F.2d 256 (5th Cir.1984); *U.S. v. Mendoza,* 727 F.2d 448 (5th Cir.1984); *U.S. v. Estrada,* 733 F.2d 683 (9th Cir.1984).

and the feasibility of rectifying any prejudice by a continuance, and any other relevant circumstances. *U.S. v. Sarcinelli,* 667 F.2d 5 (5th Cir. 1982) (Unit B). It is not contended that the government intentionally concealed the passports or that the government counsel was incorrect in stating that he did not know of them until the day of the trial. Agents testified that they had not foreseen that they would be exhibits. There was no memorandum or paperwork in government files showing that the passports had been found.

The district court found that the two defendants were not prejudiced. We agree.

■ Carmen Aras was a fugitive and unavailable as a witness. The various agents that Federico Aras contended might shed some light on the matter had no obligation to talk to the defense before trial. (There was no showing by Aras that any of the agents whose testimony might have been relevant was unavailable.) The central testimony concerning the contents of the suitcase was that of Sennett and Trouville, and both testified. They were cross-examined on where the passports were found, what they did with them, and why they were not listed in any inventory or report.

The only relevance of the passports was as the basis for an inference that Federico was, in a physical sense, tied to cocaine. There was no contention that Federico had recently entered the country with his passport, or that he intended to flee with it, or that he was engaged in travel back and forth to some source of cocaine material. There was additional, strong evidence connecting him with the cocaine operation and with the product produced by it. During surveillance he was seen carrying a bucket among the buildings. Found in the chicken shed, where he was standing, was a Buchner funnel with filter paper in it with cocaine on it. The supply room in the back of the chicken shed contained a stainless steel regulator and sulfuric acid, items necessary to produce cocaine. Other items in the shed or the supply room included glassware, beam scales, chemicals, and other equipment used for chemical processing. Also found were an airline ticket for Bolivia in his name, together with a ticket for Rojas, showing them traveling on the same flight on the same day. In the incubator shed, close by the chicken shed, cocaine was drying in the incubator. The door to the shed was open, and cocaine was visible through open windows. An odor of cocaine emanated from the shed. The odor of ether was present and had been pervasive over the premises. Barrels of chemicals used in processing cocaine were found on the premises. Photographs found at the scene associated Federico Aras with Vargas and Rojas.

The district court did not err in denying a mistrial or continuance, and in only granting an extended overnight recess, with respect to the passports.

## IV. SUPPRESSION OF EVIDENCE

Federico's argument that the government suppressed evidence of his arrest and acquittal in Bolivia for operation of a cocaine laboratory is frivolous. Argument over this point was settled by a stipulation entered at trial.

## V. SUFFICIENCY OF THE EVIDENCE

■ The facts already discussed show evidence sufficient as to each count and all defendants. Specific comment is required only as to Vargas. He had not been previously observed at the premises. He was found crouched beside the incubator. There was cocaine drying in the incubator beside him, where it was visible, and there was a smell of both ether and cocaine. Vargas was linked to other defendants by photographs and by an airline ticket to Bolivia found on the premises, to which Federico Aras also had a ticket. He relies on *U.S. v. Pintado,* 715 F.2d 1501 (11th Cir.1983) where this court held that the defendant's mere presence in a house, hiding in a closet, was an insufficient predicate for conviction of conspiracy relating to marijuana located in the garage of the house. Pintado's presence was both inculpatory, in the sense of lending an inference

of concealment, but it was also exculpatory because his place of hiding was disassociated from the marijuana, which was not even visible from the house. Vargas's act of concealment and place of concealment were both inculpatory. His hiding place was inches, or at most a few feet, from drying cocaine, the smell of which was discernible.

AFFIRMED.