Charles Gray was convicted for the unlawful possession of cocaine and sentenced to five years' imprisonment. Three issues are raised on appeal.
 I
The admission of the hearsay testimony at the hearing on the motion to suppress the cocaine did not deny Gray his constitutional right to confront and cross-examine his accusers.
At the hearing, the State's evidence showed that on October 24, 1985, Tommy Barlow, employed at a Federal Express office in Memphis, Tennessee, noticed a package which had been damaged in shipment and suspected that it contained "some type of drugs." The package was from Mary Young in Los Angeles, California, and addressed to Robert Watson, 1508 Plover Street, Mobile, Alabama.
Barlow contacted Joseph Bettner, a special agent with the Federal Narcotics Drug Enforcement Administration in Memphis. Agent Bettner went to the Federal Express office and inspected the package which contained 92 "glassine envelopes." Bettner, based on his experience, suspected that these packets contained L.S.D. The package also contained one glassine packet containing white powder which tested positive for cocaine.
Agent Bettner contacted Mobile Deputy Sheriff John Pigott and a controlled delivery was arranged. The package was forwarded to Mobile, where Deputy Pigott, disguised as a Federal Express delivery man, delivered the package to the address on Plover Street. Gray accepted the package and signed as "R. Watson."
Later, Gray, who was under police surveillance, left the package at a residence on Marine Street. Mobile Deputy Sheriff James Long went to the Marine Street address and obtained a consent to search from the female resident, who, upon request, removed the package from a closet and gave it to Deputy Long. The deputy then obtained a search warrant and opened the package.
Federal Express employee Barlow did not testify at the hearing on the motion to suppress. Agent Bettner was allowed to testify to what Barlow had told him and to Barlow's actions in connection with the package over the objection that it deprived the defendant of his "right to confront and cross-examine." The trial judge overruled the motion to suppress despite his expressed "concern" about this issue.
"There is a large difference between [what is required to prove guilt in a criminal case and what is required to show probable cause], . . . and therefore a like difference in the quanta and modes of proof required to establish them."Brinegar v. United States, 338 U.S. 160, 173, 69 S.Ct. 1302,1309, 93 L.Ed. 1879 (1949). "[I]nformation which would be inadmissible at trial on hearsay grounds may be used to show probable cause." W. LaFave, 1 Search and Seizure at p. 469 (1978). *Page 1028 
"[C]ertainly there should be no automatic rule against the reception of hearsay evidence" in proceedings where the judge himself is considering the admissibility of evidence.United States v. Matlock, 415 U.S. 164, 175, 94 S.Ct. 988, 995,39 L.Ed.2d 242 (1974).
 " 'Should the exclusionary law of evidence, "the child of the jury system" in Thayer's phrase, be applied to this hearing before the judge? Sound sense backs the view that it should not, and that the judge should be empowered to hear any relevant evidence, such as affidavits or other reliable hearsay.' C. McCormick, Evidence § 53, p. 122, n. 91 (2d ed. 1972)." Matlock, 415 U.S. at 175, n. 12, 94 S.Ct. at 995.
See also 3 Search and Seizure at § 11.2(d).
The hearsay in this case is reliable because Barlow was a citizen-witness whose information carried "indicia of reliability." 1 Search and Seizure at p. 591. The "most sound position on the matter" is that "'if the citizen or victim informant is an eyewitness this will be enough to support probable cause even without specific corroboration of reliability.' " 1 Search and Seizure at p. 592, quoting fromAllison v. State, 62 Wis.2d 14, 214 N.W.2d 437 (1974). See alsoMauldin v. State, 402 So.2d 1106, 1108 (Ala.Cr.App. 1981). "[I]nformation provided by a businessman regarding his business, where there is no showing of any possible motive to fabricate, is inherently reliable." United States v. Spach,518 F.2d 866, 871 (7th Cir. 1975).
 II
Gray contends that the affidavit in support of the search warrant was made in reckless disregard of the truth and contained false information.
The affidavit of Deputy Long asserted that Deputy Pigott received information from Agent Bettner that the package "contain[ed] 92 hits of LSD and one gram of cocaine." At the hearing, Deputy Long testified that Deputy Pigott gave him that information. The affidavit also stated that Deputy Pigott would deliver "said package to address on same packages." (Emphasis added.)
Agent Bettner testified that he did not tell Deputy Pigott the weight of the packet of cocaine. Bettner testified, "I told him it was 92 small packets and a larger packet containing a small amount of white powder that I tested for cocaine."
Deputy Pigott testified that Agent Bettner told him that the larger package contained cocaine and that "the other 92 packets that he suspected to contain LSD, but he didn't know; he was afraid to touch it."
The State stipulated that there was no LSD in the packets and that one packet contained.29 grams of cocaine. The State argued that the reference in the affidavit to packages was a typographical error. The trial judge found that the use of the word "packages, plural . . . could have easily come about from the fact that there were 93 packages in the large package."
Within the circumstances of this case, the false allegations in the affidavit appear to be the result of negligence and carelessness rather than deliberate falsity or reckless disregard. However, even if the misstatements were intentionally or recklessly made, the cocaine found in the package is not due to be suppressed because the misstatements were not necessary to the finding of probable cause. 2Search and Seizure at p. 66. Suppression is required only when it appears that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." Franks v. Delaware, 438 U.S. 154,156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). See alsoUnited States v. Coronel, 750 F.2d 1482, 1485-86 (11th Cir. 1985).
 III
Gray's statement was not obtained in violation of the rule ofEdwards v. Arizona, 451 U.S. 477, 101 S.Ct 1880, 68 L.Ed.2d 378
(1981), that when an accused expresses a desire to cooperate with the police only through counsel, no further interrogation is permitted until counsel is made available.
Upon his arrest, Gray was initially advised of hisMiranda rights by officers *Page 1029 
who did not testify at the hearing on the motion to suppress. At that hearing, Gray did testify and stated that, in response to "those Miranda rights, he replied, 'Where's the counselor?' "
 "THE COURT: Did you tell them you wanted a counselor?
 "THE WITNESS: I told them I wanted a counselor, but I don't know which officer it was. It wasn't Mr. Pigott. Mr. Pigott came up after I was sitting there on Marine Street — Mr. Pigott came up about five minutes later, and I had been sitting there ten minutes on Marine Street when he went in and got the package out of the house. Mr. Pigott came up ten minutes later, I had been sitting there. I don't know what officer."
After Gray asked this question, he was taken to an office of the Drug Enforcement Administration in Mobile where he was advised of his Miranda rights by Deputy Pigott, after which the following occurred:
 "[Gray] A. 'Yes. I understand them but what you want me to do? Wait till I get an attorney to tell you what I'm telling you now or. . . .?'
 "[Deputy Pigott] Q. 'No. I'm just explaining to you the rights that you do have. You don't have to have an attorney present while you talk to us.'
 "A. 'What do you want me to do, give up my rights?'
 "Q. 'You can waive your rights to counsel at this time and talk to us about the situation which occurred this morning. We just are under obligation to advise you that you do not have to talk to us if you don't want to. Do you understand this?'
"A. 'Yes, sir.'
 "Q. 'With these rights in mind do you want to talk to us about what happened this morning?'
 "A. 'Yeah, I'll tell you the same damn story right now.' "
At the hearing, defense counsel argued that Gray's question "Where is the counselor?" constituted a request for counsel. The trial court rejected this contention:
 "THE COURT: Well, in the first place, it ain't gospel; that's his testimony that that's what he said. And in the second place, I don't consider that, asking 'Where's the counselor,' — if he said that — that that would be the same thing. And when they told him, 'Listen, if you want a lawyer before you make a statement, you're entitled to one and we'll get you one,' and he goes ahead and makes a statement, that's good enough for me."
Because Gray's testimony stands unrefuted by any witness, it cannot be disregarded simply because it is not corroborated or because it comes from the accused. However, we agree with the trial judge's finding to the effect that Gray's "Where's the counselor?" was not a clear request for counsel.
Gray's response to his Miranda rights — "Where's the counselor? " — is, at best, an ambiguous and equivocal request. For that reason, Deputy Pigott followed proper procedure.
 "In Nash v. Estelle, 597 F.2d 513 (5th Cir. 1979) (en banc), we established the procedure to be followed when a suspect expresses an equivocal request for counsel during questioning. If a suspect is indecisive in his request for counsel, law enforcement officials must cease the interrogation unless they ask the suspect further questions to clarify whether the suspect wants to consult with an attorney before continuing with the interrogation. However, such questioning is to be limited to this clarification and cannot be used as a means of eliciting any incriminating statements from the suspect relating to the subject matter of the interrogation."
* * * * * *
 " '[T]he limited inquiry permissible after an equivocal request for counsel may not take the form of an argument between the interrogators and the suspect about whether having counsel would be in the suspect's best interests. [Thompson v. Wainwright, 601 F.2d 768, 772 (5th Cir. 1979)]. We held also that the scope of this limited inquiry does not encompass a presumption by the interrogator to tell the suspect what counsel's advice to him would be if he were present.' Id." *Page 1030 United States v. Cherry, 733 F.2d 1124, 1130 (5th Cir. 1984).
While it is permissible and highly recommended for the questioning official to seek clarification of a suspect's equivocal request for counsel, the necessity for such clarification will depend upon the totality of the circumstances in each case. Hamilton v. State, 492 So.2d 331,334 (Ala.Cr.App. 1986); McCall v. State, 501 So.2d 496
(Ala.Cr.App. 1986); Williams v. State, 387 So.2d 295, 297
(Ala.Cr.App. 1980).
We recognize and adhere to the principle that "an accused's post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490,495, 83 L.Ed.2d 488 (1984) (emphasis in original). "Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." Smith, 469 U.S. at 98,105 S.Ct. at 494. However, here, the initial request for counsel was ambiguous. Gray was not badgered to speak as a result of police overreaching.
Having answered the issues raised on appeal, we find that the judgment of the circuit court is due to be affirmed.
AFFIRMED.
All Judges concur.