746 So.2d 1052 (1999)
L.L.J.
v.
STATE.
CR-97-1518.
Court of Criminal Appeals of Alabama.
April 30, 1999.
*1054 P. Leigh Sansone, Bessemer, for appellant.
Bill Pryor, atty. gen., and Frances R. Clement, asst. atty. gen., for appellee.
LONG, Presiding Judge.
The appellant, L.L.J., appeals from the juvenile court's order transferring her to the circuit court for prosecution as an adult on the charge of attempted murder.
During the probable-cause phase of the appellant's transfer hearing, J.M. testified that at around 1:00 p.m. on November 14, 1997, she and the appellant left school with C.A. and another juvenile. The four juveniles drove to the appellant's house in a pickup truck and parked in the driveway next door. J.M. testified that the appellant and C.A. then entered the appellant's house; she said she and the other juvenile remained in the truck. J.M. stated that as she sat in the truck, she heard a noise that sounded like a door slamming and then saw the appellant and C.A. running out of the appellant's house toward the truck, screaming. J.M. testified that when she asked the appellant what had happened, the appellant told her that she had shot her mother. The four juveniles drove to a pay telephone, where they telephoned 911 for assistance for the appellant's mother. They then drove to J.M.'s house.
J.M. testified that later on the day of the shooting, the appellant gave her several letters and told her to throw them away. One of the letters, which the appellant had addressed to C.M., discussed planning the shooting. J.M. testified that she later turned the letters over to the police.
Jim Rice, a sergeant with the Birmingham Police Department, testified that he was called to the appellant's house following the shooting. When he arrived at the scene, the appellant's mother, who had been shot in the face, was being tended to by paramedics. Sergeant Rice testified that on November 16, 1997, two days after the shooting, the appellant turned herself in to the police department. The appellant arrived at the police station accompanied by a friend and the friend's mother. Sergeant Rice stated that after the appellant had waived her juvenile Miranda rights, she gave a statement admitting that she had shot her mother "because her mother was mean to her." (R. 92.) In addition, said Sergeant Rice, the appellant told him that she and C.A. had planned to kill their parents and that this plan had originated with C.A. According to Sergeant Rice, the appellant stated that she got the gun she used to shoot her mother from C.A. the day before the shooting.
Sergeant Rice testified that on November 16, 1997, J.M. gave him several letters written by the appellant, which J.M. told him the appellant had given to her and told her to destroy. The appellant's mother testified at the hearing and identified the handwriting on the letters as the appellant's. At the conclusion of this phase of the transfer hearing, the juvenile court found that there was probable cause to believe that the appellant had committed the offense of attempted murder.
At the dispositional phase of the transfer hearing, Dan Sudd, a juvenile probation officer with the Jefferson County Family Court, testified that he was assigned to review the appellant's case. Sudd testified that after conducting an investigation into the appellant's background and into the incident, and upon considering the relevant statutory factors, it was his opinion that the appellant should be transferred to the circuit court for prosecution as an adult. In this regard, Sudd stated:
"[I]t would be in [the appellant's] best interest to keep it in the juvenile court. But the place and where it occurred, who it occurred to and the manner in which it occurred, I think she is definitely a threat to the safety of the community. And after taking a lot of things under consideration and several discussions with [the appellant], I just think the safety of the community just overshadows much more. And I feel that *1055 this case should be transferred to the criminal court for adult prosecution."
(R. 116.) The written report prepared by Sudd was also admitted into evidence. In that report, Sudd wrote, in part:
"[The appellant] presents a virulent threat to the safety of the community if the allegations made by her accuser are true. Her likelihood of benefiting from any treatment within the juvenile justice system is questionable."
(C. 47.) Sudd also provided testimony concerning the appellant's various disciplinary and truancy problems at school. In addition, Sudd recounted several incidents the appellant had been involved in while in detention, including having in her possession prohibited items; instigating disputes; placing Nazi, Ku Klux Klan, and satanic symbols on letters she had written; and, in one of those letters, asking a friend to beat up someone the appellant was angry with and to send her a photograph of the victim after the beating.
The state called two expert witnesses to testify concerning psychological evaluations that they had performed on the appellant. Dr. Kyle Echols, a child psychiatrist, testified that he had evaluated the appellant and had diagnosed her as having a "conduct disorder [with] adolescent onset." (R. 238.) He stated that there was not a good treatment available for this disorder, that the appellant's "prognosis would be poor," and that "the chances for significant improvement as far as responding to some psychiatric intervention would not be particularly promising." (R. 244.) The written psychological report prepared by Dr. Echols was admitted into evidence. Dr. Gypsy Abbott, a professional adolescent counselor, testified that she had performed two psychological tests on the appellant: an IQ test, the results of which indicated that the appellant's IQ was 73 and that she had a possible learning disability, and the Minnesota Multiphasic Personality Inventory, which Dr. Abbott stated indicated that the appellant had emotional problems. The written report prepared by Dr. Abbott and reflecting her psychological evaluations of the appellant was admitted into evidence.
During the dispositional phase of the transfer hearing, the appellant called Dr. Robert Lyman to testify on her behalf as an expert in the area of child psychology and on the rehabilitation facilities available through the juvenile court system. Although the juvenile court certified Dr. Lyman as an expert, the court refused to allow Dr. Lyman to testify, on the ground that he had not personally interviewed the appellant.
At the conclusion of this phase of the transfer hearing, the juvenile court granted the state's motion to transfer the appellant to the circuit court for prosecution as an adult.

I.
The appellant, who was 15 years old at the time of the offense, contends that the juvenile court erred by admitting her statement to police into evidence during the probable-cause phase of her transfer hearing because, she says, she did not knowingly, voluntarily, and intelligently waive her juvenile Miranda rights before making the statement.
In Ex parte Smith, 611 So.2d 1023 (Ala. 1992), the Alabama Supreme Court stated:
"When the State offers in evidence a juvenile's statement, it must show that the juvenile made the statement after being advised of his rights under Rule 11[(B)], Ala.R.Juv.P. Ex parte Whisenant, 466 So.2d 1006 (Ala.1985); Carr v. State, 545 So.2d 820 (Ala.Cr.App.1989). Rule 11[(B)] requires that a juvenile be given the standard Miranda warnings and also requires that he be told that he has the `right to communicate with [his counsel, parent, or guardian if they are not present] and that, if necessary, reasonable means will be provided for him to do so.'
"`Miranda [v. State of Arizona] holds that "[t]he defendant may waive *1056 effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. [436], at 444, 475, 86 S.Ct. [1602], at 1612, 1628 [16 L.Ed.2d 694 (1966)]. The inquiry has two distinct dimensions. Edwards v. Arizona, [451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981)]; Brewer v. Williams, 430 U.S. 387, 404 [97 S.Ct. 1232, 1242, 51 L.Ed.2d 424] (1977). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.'

"Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140-41, 89 L.Ed.2d 410 (1986).
"`The United States Supreme Court has specifically held that the "totality of the circumstances" test is applicable when determining the admissibility of a juvenile's confession:
"`"This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved.... The totality approach permitsindeed it mandatesinquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."`
"Carr, 545 So.2d at 822 (Ala.Cr.App. 1989), quoting Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)."
611 So.2d at 1024-25.
In O.M. v. State, 595 So.2d 514 (Ala.Cr. App.1991), writ quashed, 595 So.2d 528 (Ala.1992), this court recognized:
"`[w]here, on the issue of the voluntariness of a confession, evidence offered by the defendant conflicts with that offered by the State, it creates a question of fact for the trial judge, Callahan v. State, 557 So.2d 1292, 1299 (Ala.Cr.App.), aff'd, 557 So.2d 1311 (Ala.1989), [cert. denied, 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990),]' and that `[a] trial judge's finding of voluntariness need only be supported by a preponderance of the evidence, Seawright v. State, 479 So.2d 1362, 1367 (Ala.Cr.App.1985), and "will not be disturbed on appeal unless found to be manifestly contrary to the great weight of the evidence." Malone v. State, 452 So.2d 1386, 1389 (Ala.Cr.App. 1984),' Dixon v. State, 588 So.2d 891 (Ala.Cr.App.1990), reversed as to result, 588 So.2d 903 (Ala.1991)."
595 So.2d at 523.
"The first sentence of § 12-15-66(b)[, Ala.Code 1975,] provides that `[a]n extrajudicial statement which would be constitutionally inadmissible in a criminal proceeding shall not be received in evidence over objection.' Section 12-15-66(b) applies to transfer hearings, and expresses a legislative policy of excluding, at juvenile proceedings, evidence which could not be constitutionally admitted in adult criminal proceedings. A statement that would not be admissible in a criminal adjudication of guilt is not admissible at a transfer hearing."
O.M., 595 So.2d at 518 (citations omitted).
Here, there was evidence that the appellant turned herself in to the police department two days after the shooting incident. *1057 She arrived at the police station accompanied by a friend and by the friend's mother. Sergeant Jim Rice of the Birmingham Police Department testified that he then fully advised the appellant of her juvenile Miranda rights as required under Rule 11(B), Ala.R.Juv.P. Sergeant Rice stated that the appellant indicated to him that she understood those rights, that she read out loud from the waiver form without any apparent difficulty, and that she then signed the waiver form. In Sergeant Rice's opinion, the appellant appeared to understand her rights. He stated that she appeared alert and that she did not appear to be under the influence of drugs or alcohol.[1] He stated that the appellant did not request or indicate in any way that she wanted to contact a parent, guardian, or attorney. Sergeant Rice testified that before he advised the appellant of her rights, he asked her if she wanted her friend's mother to be present during the police interview, and the appellant unequivocally stated that she did not want anyone present. The interview, which lasted approximately 42 minutes, began at around 1:40 p.m. Sergeant Rice stated that he did not threaten the appellant or promise her any reward for cooperating, and that no manner of coercion was employed to induce the appellant into making a statement.
The appellant argues that the interview should not have been conducted before a parent, guardian, or attorney was contacted and was then present in her behalf at the interview. However, the evidence shows that after the appellant was advised of her rights under Rule 11(B), Ala.R.Juv.P., she never requested to speak to a parent, a guardian, or an attorney. "`In Alabama, there is no requirement that the juvenile's parents be notified before or be present when the juvenile waives his constitutional rights. Likewise, there is no statute mandating the presence of a parent, guardian, legal custodian or attorney of a child during interrogation.'" O.M., 595 So.2d at 525, quoting Ash v. State, 424 So.2d 1381, 1386 (Ala.Cr.App. 1982). The appellant also argues that her allegedly low level of intelligence rendered her incapable of understanding her rights or of intelligently waiving them. While the evidence of the appellant's intelligence was a factor in determining whether she intelligently and voluntarily waived her rights, it was but one factor affecting the validity of her waiver of rights. See Hogan v. State, 663 So.2d 1017, 1020-21 (Ala. Cr.App.1994).
Considering the totality of the circumstances in this case, we find no error in the juvenile court's determination that the appellant knowingly, voluntarily, and intelligently waived her juvenile Miranda rights before giving her statement to the police. Thus, the juvenile court did not err in admitting the appellant's statement into evidence.
Moreover, even if the appellant's statement was erroneously admitted into evidence, the error was harmless. In ruling that there was probable cause to believe that the appellant committed the offense, the juvenile court found:
"What I'm going to do after hearing the evidence, I'm going to find that probable cause does exist. And based on the testimony I've heard and assuming that the [appellant's] statement was improperly admittedI didn't make that ruling. I'm still going to base my finding on the statement that was made to another witness that's testified that the [appellant] had told her that she had shot her mother."
(R. 108.) Thus, the juvenile court found that even if the appellant's statement was excluded from consideration, J.M.'s testimony *1058 that the appellant told her that she had shot her mother was sufficient to establish probable cause to believe that the appellant had committed the offense.
A transfer hearing is not a hearing to adjudicate the guilt or innocence of the accused, but is in the nature of a preliminary hearing to determine whether there is probable cause to believe that the crime occurred and that the accused committed it. M.S.B. v. State, 651 So.2d 69, 71 (Ala.Cr.App.1994). Accordingly, in the context of a transfer hearing, the harmless error doctrine allows a finding of probable cause when, after the incompetent evidence is excluded, there is sufficient competent evidence to support a finding of probable cause. See Gray v. State, 507 So.2d 1026, 1028 (Ala.Cr.App.1987) (an affidavit supporting a search warrant will still be deemed sufficient to establish probable cause where, after excision of incompetent material from the affidavit, the remaining content is sufficient to establish probable cause); see also 2 LaFave & Israel, Criminal Procedure § 14.4(a) at 263-64 (1984) (the question in a harmless error analysis where magistrate received incompetent evidence in making a probable-cause determination for binding over the accused is not whether the incompetent evidence could possibly have influenced the magistrate, but whether the remaining evidence sustains a finding of probable cause). We hold that whether the juvenile court considered the appellant's inculpatory statement to the police in addition to J.M.'s testimony that the appellant told her that she had shot her mother, or whether the court considered only J.M.'s testimony, there was ample evidence to sustain a determination that there was probable cause to believe that the appellant had committed the offense with which she was charged (see Issue II in appellant's brief).

II.
The appellant contends that the juvenile court erred in relying on J.M.'s testimony to sustain its finding of probable cause because, the appellant says, J.M. "did not prove herself even minimally credible." (Appellant's brief at p. 11.) The appellant's claim in this regard is without merit. "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial.... `[T]he credibility of witnesses and the weight or probative force of testimony is for the [trier of fact] to judge and determine.'" Johnson v. State, 555 So.2d 818, 820 (Ala.Cr.App. 1989), quoting Harris v. State, 513 So.2d 79, 81 (Ala.Cr.App.1987). Furthermore, "`[t]his Court must view the evidence in the light most favorable to the State, and "draw all reasonable inferences and resolve all credibility choices in favor of the trier of fact."'" D.L. v. State, 625 So.2d 1201, 1204, (Ala.Cr.App.1993), quoting Woodberry v. State, 497 So.2d 587, 590 (Ala.Cr.App.1986).

III.
The appellant contends that the juvenile court erred by admitting into evidence at the dispositional phase of her transfer hearing a letter that she wrote to one of her friends after she was arrested on the charge of attempted murder. The state offered the letter (State's Exhibit 3) as evidence of the appellant's demeanor, one of the six statutory factors the juvenile court must consider in determining whether to transfer a juvenile to circuit court for prosecution as an adult. See § 12-15-34(d)(4), Ala.Code 1975. The appellant claims that the letter should not have been admitted because it contained details of her meetings with her attorney, which she says were protected under the attorney-client privilege. She further claims that the letter's contents were irrelevant to the material issues in her case and that, even if relevant, the prejudicial effect of the letter's contents far outweighed their probative value.
The appellant's claim that the contents of the letter were protected under the attorney-client privilege is not preserved *1059 for appellate review, because she never raised this specific claim in the juvenile court. "The trial court will not be placed in error for grounds not raised at trial." Perkins v. State, 715 So.2d 888, 894 (Ala.Cr.App.1997). See A.H. v. State, 601 So.2d 213, 215 (Ala.Cr.App.1992) ("error cannot be asserted for the first time on appeal").
The contents of the letter at issue tended to suggest, among other things, that the appellant lacked remorse for shooting her mother and that she was defiant and resented being called to answer for her alleged acts. "Trial courts are vested with considerable discretion in determining whether evidence is relevant, and such a determination will not be reversed absent plain error or an abuse of discretion." Hayes v. State, 717 So.2d 30, 36 (Ala.Cr.App.1997). "Alabama recognizes a liberal test of relevancy, which states that evidence is admissible `if it has any tendency to lead in logic to make the existence of the fact for which it is offered more or less probable than it would be without the evidence.'" Id. We find no abuse of discretion in the juvenile court's determination that the contents of the letter were relevant to the issue of the appellant's demeanor.
The appellant argues that even if the letter's contents were relevant, the letter should have been excluded from evidence because, she says, the prejudicial effect of the letter's contents far outweighed their probative value. She contends that the letter contained matters merely cumulative to other evidence already presented during the transfer hearing and that it served only to inflame the trier of fact. Under Rule 403, Ala.R.Evid., relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." "The power to make this determination is vested in the trial court[, and] [w]e will not disturb such a determination unless it is clearly an abuse of discretion." Hayes, 717 So.2d at 37. Contrary to the appellant's assertion, the letter was not merely cumulative to other evidence already presented. In fact, it appears from the record that the letter was the only document entered into evidence for the purpose of demonstrating the appellant's demeanor. Because the letter was relevant to demonstrate the appellant's demeanor and was not cumulative of other evidence, we find that the danger of unfair prejudice did not substantially outweigh the probative value of the letter. Therefore, the juvenile court did not err in admitting the letter into evidence.

IV.
The appellant contends that the juvenile court erred by refusing to allow Dr. Robert Lyman to testify on her behalf as an expert in the area of child psychology and on the rehabilitation facilities available through the juvenile court system.
During the dispositional phase of the transfer hearing, after the appellant's counsel's proffered Dr. Lyman's credentials, the following exchange took place:
"[Appellant's counsel]: Your Honor, at this time I'd like to offer Dr. Lyman as an expert on the subject of child psychology with an emphasis on juvenile justice issues.
"[Prosecutor]: I don't recall anything being said about juvenile justice issues. I know Dr. Lyman personally. We've known each other for many years and we're both remembering how long we've known each other particularly through report [sic]. I know he's certainly well qualified individually in his areas. And juvenile justice issues may very well be one.
"But I'm also aware from having spoken with him just prior to lunch that he has never interviewed this juvenile. He has not viewed to my knowledge any of the tests that were conducted on her, has done no testing himself. And to my knowledge has donehad the opportunity to do nothing more other than to *1060 simply look at the reports of twoof the psychiatrist and the psychologist who actually did do the testing and the interviews. If all he's going to do is recap or
"[Appellant's counsel]: Is this going to be a voir dire?
"[Prosecutor]: I'm talking to the judge right now. It's an objection and I'm leading up to the objection part. I don't see the relevancy of having this witness come in and simply go over what the two other reports are without having done the testing and the interviews that would be required to give a valid assessment of his own. So, while he may be certainly qualified as an expert, I don't see the relevance at this point.
"[Appellant's counsel]: Well, Your Honor, there are a number of reasons for its relevance. First of all, he's clearly an expert. We certainly tendered him as an expert in child psychological issues and juvenile justice issues which are among the articles and his experience at Brewer's Porch and with [the Department of Youth Services].
"[The Court]: Okay. I will qualify him as an expert. Okay. Now, I guess we might need to go see what the defense is planning to call him as so that I can find out.
"[Appellant's counsel]: Yes, Your Honor. I'm calling him in the area of child psychologyas an expert in the areas of child psychology and he has emphasis in juvenile justice issues. He's worked extensively with juveniles both in his administrative capacity at Brewer Porch, when he did his consulting at the Department of Youth Services. He is aware of the sorts of not only treatment facilities
"[The Court]: I understand. What is the purpose of calling him is what I need to know?
"[Appellant's counsel]: He's testifying on disposition as to some of the elements of the sorts ofthe six factors that the Court has to consider when transferring the child.
"[The Court]: I mean, hasmaybe I need to ask him some questions. Have you had any dealings with this child at all?
"[Dr. Lyman]: With this child?
"[The Court]: Yes.
"[Dr. Lyman]: No, sir.
"[The Court]: Have you conducted any interviews or tests with her?
"[Dr. Lyman]: No, I haven't.
"[The Court]: The only thing you've done is readhave you read copies of evaluations that have been performed?
"[Dr. Lyman]: Yes, I have.
"[Appellant's counsel]: Your Honor, further he has been privy to some articles that were actually generated by they're not in evidence at this timebut some of [the appellant's] own personal letters and things that have been generated by [the appellant] herself. Although, he has not actually spoken [to her] other than meeting herhe spoke to her briefly. He has been apprised of the nature of the evaluations and some of her own things that she's written and some of her letters which we have.
"... Dr. Lyman testified that in his capacity right now what he currently does as an administrator is he has other people under him conduct tests, write the results and their findings and then based on their finding results, he can make an evaluation based on that. That's typical. That's how he normally does it. That's what he's done in this case.
"[The Court]: You've had some tests done on this child?
"[Dr. Lyman]: I have not had some tests done. I've looked at some testing.
"[The Court]: At this time, I'm going to sustain the state's objection.
"[Appellant's counsel]: Your Honor, one of the things that the Court has to consider in this case is the nature of rehabilitative efforts.

*1061 "[The Court]: I not only have to, but I'm going to consider that. I'm not going to consider testimony from somebody that's not involved on this case when I've already had that done. Okay.
"[Appellant's counsel]: Well, yes, sir. Dr. Lyman is uniquely qualified in a way that other experts
"[The Court]: He is an expert. I agree with that. But unless it can be shown to me that he has talked to this child whereby he can grant a basis for making a recommendation as far as disposition, I'm going to sustain the State's objection.
"[Appellant's counsel]: Your Honor, if I may be heard on that, please, for the record.
"[The Court]: Go ahead and then we're going to move on. We've got a lot to cover.
"[Appellant's counsel]: Yes, sir. Thank you. He is uniquely qualified in that he is aware of the sorts of rehabilitative services that are offered by some of the institutions in which he's been affiliated with very closely. Among those [the Department of Youth Services] and among those Brewer's Porch. He is aware of and dealt with children who have some of the same things that this child has been diagnosed with. He is able to testify. And that is directly relevant to the six factors in this case.
"We've heard the probation officer's testimony. And this is in rebuttal among other things to the probation officer's testimony which we've heard because he stated in his testimony and also in his report that there isn't any rehabilitative service that would be available for [the appellant]. This testimony is directly
"[The Court]: Now, that's not what he stated. That's his opinion. That's only his recommendation.
"[Appellant's counsel]: Yes, sir. And we're offering Dr. Lyman as a rebuttal to that. He is able cite actualone thing that he's able to testify to is the sorts of services that could be offered to [the appellant]. And that's directly relevant to the Court's consideration of the six factors. So far nothing has been offered as to what might be available for her were she not transferred to the adult court.
"[The Court]: Well, you know, I understand. But at this time, I'm going to sustain the State's objection.
"[Appellant's counsel]: Your Honor, then there will be no witness to testify to the sorts of rehabilitative services that can be offered because Mr. Sudd has already been up and down and
"[The Court]: We don't know that yet. Okay. First of all, we haven't made a decision yet as far as what's going to happen. But let me present this to you, I'm aware ofI've got a book of resources on facilities that are available for children. Not only in the adult system, but also in the juvenile system. So, I'm aware of those.
"But I don't think it would be proper for him to testify, you know, at this point since he's really not had any direct involvement with this child. I don't know how he can make a recommendation even
"[Appellant's counsel]: Your Honor, we're not asking him to make a recommendation as to thewe're not asking him and we're not proffering him for that purpose. His purposes are as an expert in child psychology. He can assess those evaluations and give his opinions of those. We're not asking him to make a recommendation on the ultimate issue in this case. That wouldn't be proper for any psychologist or psychiatrist in this case to make a recommendation on the ultimate issue which would be whether or not the child should be transferred.
"But Dr. Lyman has even more specialized knowledge along those lines than Mr. Sudd does so far as what sorts of rehabilitative services could be offered. *1062 And Mr. Sudd relied very heavily as he stated on both the psychiatrist and psychologist's reports on his own. He's not an expert.
"[The Court]: Well, it's just a recommendation. Here's what I think might be proper if I decide to keep the case in the juvenile court, then it might be proper for him to testify. If I decide to send it to adult court, of course, he wouldn't be testifying. We'll have to look to the adult system to see what services would be available at that time. So, that's the reason I'm sustaining the objection.
". . . .
"[The Court]: I think he would if he had had a chance to have, you know, some involvement with this particular juvenile. As far as what's available, I'm aware like I said, I've been a juvenile judge for 17 years now. And I don't say I know every single, you know, treatment available. I am aware of a lot that's been mentioned that he started. We use the City Program. I've used Brewer's Porch. Like I say, I knowI sustain the objection.
"[Appellant's counsel]: It actually relates to a generalnot really your ruling, but the question is as a professor and a learned person in the area of psychology, he could disagree facially withfor example, if a statement was made such as adult or juvenile onset of conduct disorder has a poor prognosis. That could be facially incorrect. And we would need an expert who could clarify the record and educate the Court on at least that one point. Which is a general question and doesn't have any involvement with this child, but his understanding of psychology in general and his expertise in psychology in general.
"[The Court]: Could not the person that did the evaluation explain that?
"[Appellant's counsel]: No, because they were wrong, Your Honor.
"[The Court]: Well, you're assuming they're wrong. We're moving on. Thank y'all. Thank you so much, Doctor."
(R.216-30.)
The appellant claims that the juvenile court's refusal to allow Dr. Lyman to testify denied her a full and fair hearing on the merits and violated her constitutional right to due process. The state argues that Dr. Lyman was properly prohibited from testifying because, the state says, his testimony would have been based on facts not in evidence.
In this case, part of Dr. Lyman's testimony would have been based on the psychiatric reports of Dr. Echols and Dr. Abbott. Dr. Echols's report had already been admitted into evidence when Dr. Lyman was called to testify. Although Dr. Abbott's report was not yet in evidence, it was subsequently introduced when Dr. Abbott testified. In addition, Dr. Echols, in making his report, relied heavily on Dr. Abbott's report and incorporated a good portion of it into his own report. Therefore, Dr. Lyman would not have been testifying to facts not yet in evidence, but to facts contained in Dr. Echols's report, already in evidence.
The juvenile court's ruling that it was "not going to consider testimony from somebody that's not involved on this case" was contrary to established law. (R. 221.) It is well settled that "a medical expert [may] give opinion testimony based in part on the opinions of others when those other opinions are found in medical records admitted into evidence." Ex parte Wesley, 575 So.2d 127, 128 (Ala.1990). Furthermore, "[t]here is no reversible error if the facts upon which the opinion is based are admitted into evidence after the expert has testified." Id. at 129.
A transfer hearing is a "`"critically important" proceeding' in juvenile criminal procedure." Ex parte W.T.K., 586 So.2d 850, 851 (Ala.1991), quoting Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). Although transfer hearings are not adjudications of *1063 guilt, but, instead, are probable cause hearings to determine whether a juvenile should be transferred for prosecution as an adult, and therefore, are not always afforded the full procedural safeguards of a trial, they must still "`measure up to the essentials of due process and fair treatment.'" Id., quoting Kent, supra.
"It is particularly important to protect a juvenile's constitutional rights at a transfer hearing. To transfer a juvenile and subject him to adult treatment without protecting his constitutional rights is impermissible."
586 So.2d at 853.
"Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). "The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." Id. at 294, 93 S.Ct. 1038. Furthermore, "[i]t is the manifest duty of the courts to vindicate [the Fifth Amendment guarantee that no person shall be deprived of liberty without due process of law], and to accomplish that it is essential that all relevant and admissible evidence be produced." Boykins v. Wainwright, 737 F.2d 1539, 1544 (11th Cir. 1984).
We conclude that Dr. Lyman's testimony would have been relevant to at least one of the six factors that a juvenile court must consider when determining whether to transfer a juvenile for prosecution as an adult, see § 12-15-34, Ala.Code 1975 Dr. Lyman could have testified concerning the treatment facilities and options available for the appellant in the juvenile system, given her diagnosed condition. This testimony would have been directly relevant to the issue whether the best interests of the appellant would be served by keeping her in the juvenile system, or transferring her for adult prosecution. In addition, Dr. Lyman's testimony would have been relevant for purposes of rebutting the state's expert testimony that the appellant's conduct disorder was most likely not treatable. In essence, Dr. Lyman would have testified that the appellant was "committable to an institution" for treatment and that she could be "properly disciplined" and treated in the juvenile system. Such evidence was highly relevant to the transfer hearing, and thus should have been admitted.
Although evidentiary issues are generally within the discretion of the trial court, that discretion is not unlimited. In the present case, the juvenile court violated the appellant's due process rights by refusing to allow her to call Dr. Lyman as a witness on her own behalf. Dr. Lyman was prepared to testify to issues directly relevant to the transfer hearing. Dr. Lyman's proposed testimony concerning the treatment facilities available in the juvenile system was the only testimony of its kind. None of the state's witnesses testified to the available facilities for treating children with conduct disorder. The juvenile court's witness, probation officer Dan Sudd, merely made a blanket statement that the appellant would not benefit from treatment at any facility in the juvenile system. Dr. Lyman was prepared to testify that conduct disorder was a treatable illness, in direct contradiction to the state's expert witness, Dr. Echols, who testified that it was highly unlikely that such a disorder could be treated.
Given the appellant's inability to present any expert testimony to rebut the state's evidence, we cannot find that the juvenile court's error in prohibiting Dr. Lyman from testifying was harmless. The appellant's due process rights were violated when she was prohibited from calling a witness on her behalf. Therefore, we hold that it is necessary to remand this cause to the juvenile court with directions for that court to conduct another hearing regarding the dispositional phase of the transfer hearing, and to permit Dr. Robert Lyman to testify. In so conducting this hearing, *1064 the juvenile court may accept additional evidence as it deems necessary. If, after these additional proceedings, the juvenile court finds that the appellant should be transferred to the circuit court for prosecution as an adult, the juvenile court should file an order in compliance with § 12-15-34(d) and (f), Ala.Code 1975, taking into account any additional evidence considered by the juvenile court. The juvenile court's return should be filed with this court within 42 days after the release of this opinion.
We emphasize that this remand is applicable only to the dispositional phase of the transfer hearing. As discussed in Parts I and II of this opinion, we do not question the juvenile court's finding of probable cause, and do not require the court to hold another probable cause hearing. We pretermit discussion of any remaining issues in the appellant's brief pending the juvenile court's return to remand.
REMANDED WITH DIRECTIONS.[*]
McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
NOTES
[1] Although there was testimony at the dispositional phase of the transfer hearing that the appellant had tested positive for marijuana on the day of her confession, there was no evidence of intoxication before the juvenile court when it made its finding of probable cause, other than the unsubstantiated allegation in the appellant's motion to suppress that she "may have been intoxicated." (Supp. C. 15.)
[*] Note from the reporter of decisions: On September 10, 1999, on return to remand, the Court of Criminal Appeals affirmed, without opinion.